```
 1                    UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 2   _____

 3                               )
                                 ) CASE NO. CR16-185-JLR
 4   UNITED STATES OF AMERICA,    )
                                 ) Seattle, Washington
 5                  Plaintiff,    )
                                 ) March 26, 2024
 6   v.                          ) 8:59 a.m.
                                 )
 7   SAMUEL M. REZENE,           ) Revocation of
                                 ) Supervised Release
 8                  Defendant.    ) Evidentiary Hearing
                                 )
 9                               )
     _____
10
                  VERBATIM REPORT OF PROCEEDINGS
11            BEFORE THE HONORABLE JAMES L. ROBART
                   UNITED STATES DISTRICT JUDGE
12   _____

13   APPEARANCES:

14

15    For the Plaintiff:      STEPHEN PAUL HOBBS
                              TODD GREENBURG
16                            U.S. Attorney's Office
                              700 Stewart Street, Suite 5220
17                            Seattle, WA 98101-1271

18
      For the Defendant:      CHRISTOPHER R. BLACK
19                            Black & Askerov PLLC
                              705 2nd Avenue #1111
20                            Seattle, WA 98104

21    U.S. Probation
      Officer:                MI-YOUNG PARK
22

23
      Reported by:            MARCI E.C. CHATELAIN, CCR, RMR, CRR,
24                            Federal Court Reporter
                              700 Stewart Street, Suite 17205
25                            Seattle, WA 98101
                              marci_chatelain@wawd.uscourts.gov
```

1

<u>GENERAL INDEX</u>

<u>PAGE</u>

2

Government's Closing Argument By Mr. Greenberg          62

3

Defendant's Closing Argument By Mr. Black              65

4

Government's Rebuttal Argument By Mr. Greenberg        78

5

Oral Ruling of the Court                              79

6

7

<u>WITNESS INDEX</u>

<u>PAGE</u>

8

**BRENT WELTE**
9   Direct Examination By Mr. Greenberg                   5
    Cross-Examination By Mr. Black                       15
10  Redirect Examination By Mr. Greenberg               18
    Recross-Examination By Mr. Black                    19

11
**NEGUSE NAIZGHI**
12  Direct Examination By Mr. Greenberg                  21
    Cross-Examination By Mr. Black                       23

13
**PATRICK WALTERS**
14  Direct Examination By Mr. Greenberg                  28
    Cross-Examination By Mr. Black                       48
15  Examination By the Court                             61

16

17

<u>EXHIBIT INDEX</u>

<u>ADMITTED</u>

18

Government Exhibits 1-28                               6

19

20

21

22

23

24

25

1          PROCEEDINGS

2    _____

3          THE CLERK:  All rise, please.

4     The United States District Court for the Western District

08:59:03  5   of Washington is now in session, the Honorable James L. Robart

6   presiding.

7          THE COURT:  Please be seated.

8     The clerk will call this matter.

9          THE CLERK:  Case number CR16-185, United States versus

09:06:13  10  Samuel Rezene.

11     Counsel, please rise and make your appearances for the

12   record.

13          MR. GREENBERG:  Your Honor, Todd Greenberg and Stephen

14   Hobbs for the United States.

09:06:22  15          THE COURT:  Thank you.

16          MR. BLACK:  Good morning, Your Honor.

17     Chris Black appearing for Mr. Rezene, who is here in court

18   to my right.

19          THE COURT:  Thank you.

09:06:28  20     Counsel, it is my understanding that we are here for two

21   alleged supervised release violations, the first of which,

22   number one, is committing the crime of unlawful possession of a

23   firearm on October 31, 2023, in violation of the mandatory

24   condition; and number two, committing the crime of hit-and-run

09:06:49  25  on October 31, 2023, in violation of the mandatory condition.

1    As I understand it, Mr. Rezene has denied both of those;

2  and, therefore, the government needs to put on a case in an

3  attempt to persuade the Court.

4    The defense filed one motion, which I believe is titled

09:07:14   5  something to the effect of Exclude Hearsay Evidence at the

6  Evidentiary Hearing.

7    Do you wish to argue that, Mr. Black?  I can tell you that

8  I've read it and I think I'm well acquainted with it.

9    MR. BLACK:  Your Honor, we don't have anything in

09:07:34   10  addition to the written materials.

11    THE COURT:  All right.  Then I am denying that motion

12  at this time, which is found in the docket at 137.

13    Is the government ready to proceed?

14    MR. GREENBERG:  Yes, Your Honor, we are.

09:07:45   15    THE COURT:  All right.

16    MR. GREENBERG:  If I could have one moment with one of

17  the witnesses who just walked in?

18    THE COURT:  Yes.

19    (Off the record.)

09:08:31   20    MR. GREENBERG:  Your Honor, our first witness will be

21  Officer Brent Welte.

22    THE COURT:  Thank you.

23    THE CLERK:  Raise your right hand.

24  ///

25  ///

1      <u>**BRENT WELTE**</u>,

2   called as a witness on behalf of the Government, having been

3   first duly sworn, was examined and testified as follows:

4              THE WITNESS:  I do.

09:09:02   5              THE CLERK:  Please take the stand.

6        Please state your name and spell it for the court reporter.

7              THE WITNESS:  My name is Officer Brent Welte, spelled

8   W-e-l-t-e.

9              THE COURT:  You may inquire.

09:09:19   10              MR. GREENBERG:  Thank you, Your Honor.

11                    DIRECT EXAMINATION

12   BY MR. GREENBERG:

13   Q.   Officer, where are you employed?

14   A.   I'm sorry, can you say that question again?

09:09:26   15   Q.   Where are you employed?

16   A.   With the Seattle Police Department.

17   Q.   How long have you been with Seattle PD?

18   A.   Almost two years now.

19   Q.   And what -- what's your duty right now?  What's your

09:09:36   20   assignment?

21   A.   I'm currently assigned to the third watch, North Precinct.

22   Q.   And during the two years you've been with SPD, has that

23   been your primary assignment?

24   A.   Yes.  It's been my only assignment.

09:09:49   25   Q.   I'm going to be asking you questions about an event that

```
 1   occurred in the early morning hours of October 31st, 2023.
 2        Were you on duty at that time?
 3   A.   Yes, sir.
 4   Q.   And were you with a partner?
 5   A.   I was.
 6   Q.   Who is that?
 7   A.   Officer Hugg.
 8   Q.   At about 12:49 a.m., were you dispatched to an incident?
 9   A.   I was.
10   Q.   And what was that?
11   A.   It was a collision at 105 and Aurora.
12   Q.   Okay.  I'm going to show you -- oh, sorry.
13        MR. GREENBURG:  Your Honor, I did neglect two things
14   before we started.  If I could, at this time, I'm going to move
15   to admit all of our exhibits, Exhibits 1 through 28.  I've
16   spoken to Mr. Black about that.  There are no objections to the
17   exhibits, apart from the hearsay objection that the Court
18   already ruled upon.  So rather than do this one at a time, we
19   would move Exhibits 1 through 28 into evidence.
20        THE COURT:  Mr. Black, any objection?
21        MR. BLACK:  No, Your Honor.
22        THE COURT:  Then Exhibits 1 through 28 are admitted
23   and may be published.
24             (Government Exhibits 1-28 admitted.)
25        MR. GREENBERG:  Thank you, Your Honor.
```

09:10:04 (line 5)
09:10:16 (line 10)
09:10:31 (line 15)
09:10:51 (line 20)
09:10:59 (line 25)

1    BY MR. GREENBERG:

2    Q.    Okay.  Officer Welte, I'm going to show you Exhibit 1.

3    It's a photograph here.

4         Is this a photograph of the scene that you responded to

09:11:12    5    that you just described?

6    A.    Yes, sir.

7    Q.    Okay.  And going to Exhibit 2, you see a vehicle on its

8    side crashed into a tree; correct?

9    A.    Yes, sir.

09:11:26    10    Q.    And about -- I think you said where this was, but

11    approximately what location was this?

12    A.    105 and Aurora.

13    Q.    Okay.  Are you familiar with this building that is shown in

14    the photograph that the car just barely stopped short of?

09:11:45    15    A.    I am.

16    Q.    What is that?

17    A.    It's the DSE Aurora House.

18    Q.    And what goes on in that facility?

19    A.    It's emergency housing for people transitioning from

09:11:56    20    homelessness.

21    Q.    I want to show you Exhibit 3.

22         Is this another photograph of the crashed vehicle?

23    A.    Yes, sir.

24    Q.    And Exhibit 4, was this the license plate on the vehicle

09:12:13    25    that was crashed?

1    A.    Yes, sir.

2    Q.    Now, looking at Exhibit 5, what are we looking at here?

3    A.    We're looking at -- the vehicle is on its side.  We're

4    looking through the sunroof of where it was.

09:12:29    5    Q.    Okay.  So I guess we can see a lot of smashed glass.  Is

6    this -- was this a glass sunroof, then?

7    A.    Yes, sir.

8    Q.    Okay.  And so you were able to see into the vehicle,

9    basically, just kind of standing along the side, looking through

09:12:45    10    this broken glass?

11    A.    Yes, sir.

12    Q.    Okay.  And what portion of the vehicle is this that I'm

13    sort of highlighting with the cursor?

14    A.    That would be the backseat, sir.

09:12:56    15    Q.    Okay.  And then moving to Exhibit 6, is this sort of the

16    same vantage point, but in the front-seat area?

17    A.    Yes, sir.

18    Q.    Are you familiar with what -- with a substance called

19    whippets?

09:13:20    20    A.    Very briefly.

21    Q.    Okay.  What is a whippet?

22    A.    It's something that you can inhale to get a short,

23    temporary high.

24    Q.    Did you find whippets on this accident scene?

09:13:30    25    A.    I did.

March 26, 2024                                                      9

1    Q.    I'm going to show you Exhibit 7.  Do these appear to be

2    still shots taken from your body camera video?

3    A.    Yes, sir.

4    Q.    All right.  So the first photo in Exhibit 7, do you see on

09:13:52    5    the ground next to this vehicle there's a pink and purple item?

6    A.    Yes.

7    Q.    And by the way, who is this?

8    A.    That would be Officer Walters.

9    Q.    Okay.  And then going to the second image.

09:14:07    10         THE COURT:  Excuse me.  Would someone identify who

11   Officer Walters is?

12         MR. GREENBERG:  Yes.

13   BY MR. GREENBERG:

14   Q.    Who is Officer Walters?

09:14:14    15   A.    Officer Walters was employed with the Seattle Police

16   Department during the time of this call.  He's now working in

17   Marysville.

18   Q.    And is your understanding that he'll be here testifying

19   today as well?

09:14:25    20   A.    Yes, sir.

21   Q.    So looking at the second image of Exhibit 7, what is this

22   in Officer Walters' hand?

23   A.    I'm not quite sure if that's the box of whippet [sic] or if

24   that's the actual whippet container itself.  We found both on

09:14:43    25   scene.

1    Q.    Okay.  So this was the item that was on the ground outside

2    the car; correct?

3    A.    Yes, sir.

4    Q.    And then moving to the third image of Exhibit 7, was there

09:14:52    5    also another whippet canister found in the vehicle?

6    A.    Yes, sir.

7    Q.    And again, the last image, fourth image of Exhibit 7, does

8    this show, again, the whippet in the vehicle?

9    A.    Yes, sir.  That looks like the box.  I don't recall if the

09:15:08    10    whippet was in the box or outside of the box.

11    Q.    Okay.  At some point while you were at the scene, did you

12    or another officer call for a tow truck?

13    A.    I believe I did, sir.

14    Q.    Okay.  And did one arrive?

09:15:30    15    A.    Yes.

16    Q.    What was sort of the first thing that the tow truck did on

17    the scene?

18    A.    Flip the vehicle back over so it was right side up.

19    Q.    Okay.  And then I want to show you Exhibit 8.

09:15:50    20        Is this a photograph of the vehicle once it had been put

21    right side up?

22    A.    Yes, it is.

23    Q.    And Exhibit 9, is this another shot of the vehicle showing

24    the front-end damage?

09:16:04    25    A.    Yes, sir.

March 26, 2024

1    Q.    Now, at some point after the vehicle was put on its wheels,

2    did you look inside of it?

3    A.    I did.

4    Q.    And what was your purpose in doing that?

09:16:22    5    A.    I was trying to find a wallet, anything with some sort of

6    identification, so we could figure out who might have been

7    driving the vehicle.

8    Q.    Okay.  So what happened of note as you were initially

9    looking through the vehicle?

09:16:38    10    A.    While looking through the vehicle, I found what appeared to

11    be a loaded firearm on the driver's side floorboard.

12    Q.    Was that captured by your body camera?

13    A.    I believe it was.  I'm not quite sure if the camera

14    captured the actual gun itself.

09:16:55    15    Q.    Okay.  Well, let me show you Exhibit 10.  There are a few

16    images.  Do these, again, appear to be images taken from your

17    body camera video?

18    A.    Yes, sir.

19    Q.    So can you tell us what we're looking at here?

09:17:17    20    A.    Right there is the -- what appears to be a loaded Glock

21    firearm.

22    Q.    Where in the vehicle are we looking?

23    A.    That would be the floorboard of the driver's side.  You can

24    see kind of the center console near the bottom of the screen,

09:17:36    25    and then the driver's seat on the left side of the screen.

1    Q.    And does this look like the brake pedal, or I assume it's

2    the brake pedal here, as well?

3    A.    Yes, sir.

4    Q.    So going to the second image, this one looks a little --

09:17:49    5    looks like you've shined a light in this area, or a light was

6    shining in this area; is that right?

7    A.    Yes, sir.

8    Q.    Okay.  And is this the firearm right here?

9    A.    Yes, it is.

09:18:01    10    Q.    Okay.  I'm going to go to the third -- looks like the third

11    and final image.

12          Again, a little brighter light showing the firearm?

13    A.    Yes, sir.

14    Q.    After you saw that firearm, what did you do?

09:18:19    15    A.    I exited the vehicle and contacted my sergeant.

16    Q.    And what discussion did you-all have?

17    A.    We decided it would be best to pursue a search warrant to

18    seize the firearm, as opposed to taking it from plain view.

19    Q.    Okay.  And so what happened next?

09:18:38    20    A.    After contacting my sergeant, the vehicle -- the vehicle

21    was towed to our North Precinct, where it sat in a secure

22    parking lot pursuant to the search warrant.

23          And then upon completion of the search warrant, I went into

24    the vehicle to retrieve the firearm.

09:18:58    25    Q.    When did you apply for the search warrant in relation to

1    this incident, approximately?

2    A.    I believe I applied that same night, or it would have been

3    when I came in early the same day.

4    Q.    Okay.  And did a state court judge approve your warrant?

09:19:16    5    A.    Yes, sir.

6    Q.    I'm going to show you Exhibit 11; is this the same vehicle?

7    A.    Yes, it is.

8    Q.    And where -- where is this?  What's the scene here that

9    we're looking at?

09:19:35    10    A.    That's the North Precinct.  That's the back end of our

11    secured lot.

12    Q.    Is this where the vehicle was towed after the incident?

13    A.    Yes, sir.

14    Q.    Okay.  Looking at Exhibit 12, is this, again, another view

09:19:54    15    of the vehicle?

16    A.    Yes, sir.

17    Q.    Okay.  And is this where you executed the search warrant?

18    A.    Yes, it is.

19    Q.    Let me show you Exhibit 13.

09:20:04    20        What are we looking at here?

21    A.    We're looking inside the vehicle, the driver's --

22    passenger's -- the driver front passenger -- excuse me, the

23    front driver's side.

24    Q.    Okay.  And I'm going to zoom in.  I'm going to circle what

09:20:26    25    looks like a red, dark red splotch.  Do you see that?

1    A.    I do.

2    Q.    Do you recognize what that looks like?

3    A.    It appears to be blood.

4    Q.    Okay.  I'm going to go to the next photo here, Exhibit 14.

09:20:46    5          Is this a closer-up view of what we were just looking at,

6    the driver's side floorboard?

7    A.    Yes, it is.

8    Q.    Do you see the firearm there?

9    A.    Yes, sir.

09:20:54    10    Q.    Exhibit 15, is this a closer-up shot of the firearm?

11    A.    Yes, sir.

12    Q.    And what is this?

13    A.    The magazine well, with the magazine in it.

14    Q.    Okay.  Now going to Exhibit 16, what are we looking at

09:21:16    15    here?

16    A.    The firearm on the hood of my vehicle, showing that it's

17    unloaded and how it had a round chambered inside as well.

18    Q.    Okay.  So how did the magazine get out of the gun?

19    A.    I took it out.

09:21:31    20    Q.    Were there rounds in the magazine?

21    A.    Yes, sir.

22    Q.    And there's one round of ammunition sitting on the hood

23    here.  What's the significance of that?

24    A.    That was the round that was chambered in the firearm.

09:21:44    25    Q.    And then showing you Exhibit 17, what are we looking at

1    here?

2    A.    The serial number for the firearm, which appears to have

3    been -- attempted to have been scratched off.

4    Q.    Okay.

5                             (Off the record.)

6                MR. GREENBERG:  That's all I have for this witness,

7    Your Honor.

8                THE COURT:  Cross-examination?

9                MR. BLACK:  Thank you, Your Honor.

10                         CROSS-EXAMINATION

11   BY MR. BLACK:

12   Q.    Good morning, Officer Welte.  My name's Chris Black, and I

13   represent Mr. Rezene.

14   A.    Good morning.

15   Q.    So on the night in question, shortly after you arrived at

16   the scene, you searched the car; is that correct?

17   A.    Yes, sir.

18   Q.    And you said that you were searching for a wallet or some

19   form of ID?

20   A.    Yes, sir.

21   Q.    That was prior to having a warrant; correct?

22   A.    That is correct.

23   Q.    Did you believe that you had probable cause to search that

24   car?

25   A.    I did.  It was abandoned at the time.

1    Q.    You believed that you had probable cause because it was

2    abandoned?

3    A.    I believe I had probable cause because it was abandoned at

4    the time, but then we also found -- I'm not quite sure in what

09:23:06    5    relation I started searching for the car, from transitioning

6    from looking for a wallet, due to it being abandoned, to then

7    your defendant there was detained.  And then I was searching for

8    a wallet to see if we could tie the vehicle to him.

9    Q.    And you did that before you had a warrant; correct?

09:23:21    10    A.    Correct.

11    Q.    Okay.  And did you ever find any ID in the car?

12    A.    I did not.  I did not.

13    Q.    Or anything that tied Mr. Rezene to the car?

14    A.    Not directly, no.

09:23:35    15    Q.    You did find a gun on the floor of the car --

16    A.    Yes, sir.

17    Q.    -- correct?

18          You do not know how it got there?

19    A.    No, I don't.

09:23:45    20    Q.    You don't know who put it there?

21    A.    No, I do not.

22    Q.    You don't know how long it had been there?

23    A.    No, sir.

24    Q.    You don't know if it was there prior to the crash?

09:23:55    25    A.    No, sir.

March 26, 2024

1    Q.    Could have been put there after the crash?

2    A.    Possibly, yes.

3    Q.    There were people in the car when police arrived on the

4    scene; right?

09:24:07    5    A.    There were witnesses at the scene, yes.

6    Q.    Well, there were people rooting around in the car; isn't

7    that correct?

8    A.    Not that I saw.

9    Q.    Okay.  The accident was very significant; is that correct?

09:24:23   10    A.    Yes, sir.

11    Q.    The car was totaled?

12    A.    Yes, sir.

13    Q.    Witnesses -- well, are you aware that witnesses described

14    the car as going 90 miles per hour before it crashed?

09:24:32   15    A.    Not at the scene, no, no one had told me that.

16    Q.    Okay.  But, clearly, it was a significant accident

17    involving a lot of force that flipped the car completely over?

18    A.    That is correct, yes, sir.

19    Q.    That's the kind of thing that could certainly move

09:24:45   20    something inside the car around; is that correct?

21    A.    Yes, sir.

22    Q.    Including that firearm?

23    A.    Yes, sir.

24    Q.    So you can't say where the firearm was in the car prior to

09:24:55   25    the crash, assuming that it was in the car prior to the crash?

1    A.    No, I cannot.

2    Q.    Okay.  Did you look for blood anywhere on the vehicle?

3    A.    I did not.

4    Q.    Did you see any blood anywhere on the vehicle?

09:25:08    5    A.    At the scene when I was in the vehicle, I don't recall ever

6    looking for blood.

7         Looking back at the pictures here, you can see blood on a

8    part of the pillar that had broken off.  But when I was in the

9    car, I wasn't looking for blood, nor do I remember seeing any.

09:25:21    10    Q.    And then as to the whippets, the same basic analysis

11    applies as to the gun, right, they could have been anywhere

12    prior to the crash?

13    A.    Yes, sir.

14    Q.    Or, theoretically, even put there after the crash?

09:25:37    15    A.    Yes, sir.

16         MR. BLACK:  One moment, Your Honor, I just want to

17    check with my client.

18                   (Off the record.)

19         MR. BLACK:  Nothing further, Your Honor.

09:25:57    20         THE COURT:  All right.  Redirect?

21                   REDIRECT EXAMINATION

22    BY MR. GREENBERG:

23    Q.    I'm going to show you Exhibit 14.  Is this the blood that

24    you were just referencing that you saw in the vehicle when you

09:26:15    25    did the search warrant?

1   A.    Yes, sir.

2         MR. GREENBERG:  That's all, Your Honor.

3         THE COURT:  Recross?

4         MR. BLACK:  Very brief, Your Honor.

09:26:23   5                    RECROSS-EXAMINATION

6   BY MR. BLACK:

7   Q.    That blood that you just identified in Exhibit 14, what

8   part of the car is that, that that was on, if it would have been

9   attached?

09:26:33   10   A.    It looks like part of the C pillar.

11   Q.    Can you explain what the C pillar is?

12   A.    If you're looking at your door, the part of the -- if

13   you're inside your vehicle, the pillar on your left side between

14   like your steering wheel and your door, that kind of part that

09:26:50   15   rests right there supporting the top of the car, that would be

16   your C pillar.

17         MR. BLACK:  Okay.  Thank you.  Nothing further.

18         THE COURT:  Anything further, Counsel?

19         MR. GREENBERG:  No, Your Honor.

09:26:58   20         THE COURT:  And you may step down, Officer.  Thank

21   you.

22         MR. GREENBERG:  Your Honor, our -- the next witness we

23   plan to call, as you just learned, is now at Marysville PD and

24   he is running a little late due to traffic.  He's about

09:27:22   25   10 minutes out.  But we can call the defendant's father slightly

```
 1    out of order.  I apologize for that, but we'll do that.
 2              THE COURT:  Not a problem.
 3              MR. GREENBERG:  Okay.  And, your Honor, what we'll do
 4    is kind of skip to the end of the police contact when Officer
 5    Walters had a phone call with the parents, and then we'll put
 6    that into context with the next witness.
 7              THE CLERK:  Come on up.
 8         Please come forward.
 9         Just stand here for a moment.
10         Raise your right hand.
11                         NEGUSE NAIZGHI,
12    called as a witness on behalf of the Government, having been
13    first duly sworn, was examined and testified as follows:
14              THE WITNESS:  I will.
15              THE CLERK:  Thank you.  Please take the stand.
16         Please state your name and spell it for the court reporter.
17              THE WITNESS:  Hi.  My name is Neguse Naizghi.
18              THE CLERK:  Could you please spell that?
19              THE WITNESS:  Okay.  My name is spelled N-e-g-u-s-e,
20    last name spells N-a-i-z-g-h-i.
21              THE COURT:  You may inquire.
22         Good morning, sir.
23              MR. GREENBERG:  Thank you, Your Honor.
24    ///
25    ///
```

09:28:24
09:29:01
09:29:09
09:29:37

```
 1                      DIRECT EXAMINATION

 2    BY MR. GREENBERG:

 3    Q.    Good morning, sir.  Hi.

 4          What's your relation to the defendant here, Samuel Rezene?

 5    A.    I'm his dad.

 6    Q.    On the night that he was arrested, were you in the house

 7    with him?

 8    A.    Yeah.  Before he leave the house, we were together --

 9    Q.    Okay.

10    A.    -- at the living room.

11    Q.    Okay.  And was he living at the house at that time?

12    A.    Huh?

13    Q.    Was he living at the house during that time?

14    A.    I can barely hear you.

15    Q.    Was he living at the house during that time?

16    A.    Yeah.

17    Q.    Okay.  Now, you recall that night there was a phone call

18    that you and your wife received from a police officer?

19    A.    Yes, sir.

20    Q.    And I recently played that for you in another proceeding;

21    correct?

22    A.    Yes.

23    Q.    Okay.  I'm going to play that again for you now.

24          And then after we play it, I'll have some questions for

25    you.
```

Time stamps:
09:29:58 (line 5)
09:30:15 (line 10)
09:30:26 (line 15)
09:30:42 (line 20)
09:30:58 (line 25)

```
 1    A.    Okay.

 2          MR. GREENBERG:  And, Your Honor, it's about

 3    10 minutes.

 4                    (Exhibit played.)

 5          MR. GREENBURG:  Sorry.  I'm going to pause it there.

 6    BY MR. GREENBURG:

 7    Q.    Do you recognize the woman's voice?

 8    A.    Yeah.  My --

 9    Q.    Who is that?

10    A.    My wife.

11    Q.    Okay.  The defendant's mother?

12    A.    Yeah.

13                    (Exhibit played.)

14    BY MR. GREENBURG:

15    Q.    Okay.

16          Okay.  Sir, were the things that you told the officer true?

17    A.    Say it again.

18    Q.    Were the statements you made to the officer, were those

19    correct, were those true?

20    A.    Yeah, that's correct.  Even I gave my statement last time

21    when I was here.

22    Q.    Yeah.  Okay.

23    A.    It's the same.  Nothing change.

24    Q.    I understand.

25          You heard the officer say that there was a gun found in the
```

09:31:29  (line 5)
09:31:34  (line 10)
09:31:36  (line 15)
09:42:12  (line 20)
09:42:19  (line 25)

1    car.  Do you have any guns?

2    A.    No.  I never had a gun.

3    Q.    Okay.  And as far as you know, does your wife have any

4    guns?

09:42:35    5    A.    No.

6              MR. GREENBERG:  Nothing further, Your Honor.

7              THE COURT:  Cross-examination.

8              MR. BLACK:  Thank you, Your Honor.

9                        CROSS-EXAMINATION

09:42:45    10    BY MR. BLACK:

11    Q.    Good morning.  I'm Chris Black.  I represent your son,

12    Mr. Rezene.

13         Just a few questions.

14              THE COURT:  Mr. Black, can you use the microphone?

09:42:59    15              MR. BLACK:  Sorry, Your Honor.  Of course.

16    BY MR. BLACK:

17    Q.    You said that Mr. Rezene left the home at some point

18    earlier that night before you got that call?

19    A.    Can you repeat that for me?

09:43:15    20    Q.    Yeah.

21         You said that Mr. Rezene, when you were testifying, had

22    left the home earlier that night before you got the phone call;

23    is that correct?

24    A.    Yes.

09:43:25    25    Q.    You don't know exactly when that was, though; is that also

1    correct?

2    A.    Yeah.

3    Q.    It was, I believe you said, sometime around 11:30?

4    A.    11:30, we were together, and I was going to sleep.  I told

09:43:40  5    him, I'm going to sleep.  He said he's going to stay at home.

6    But I slept, and then my wife got a call like we hearing in the

7    statement, and she wake me up, you know.  So that's the time I

8    was talking to the officer.

9    Q.    So you didn't actually see Mr. Rezene leave with the car?

09:44:03  10   A.    Huh?

11   Q.    You did not actually see Mr. Rezene leave with the car?

12   A.    No, I didn't see him.

13   Q.    Okay.  You just, uhm -- you went to bed and then woke up

14   and saw that the car was gone?

09:44:15  15   A.    I saw, yeah, the car was gone.  And then we got the call

16   from the police, too, yeah.

17   Q.    Okay.  And after you went to sleep, did you see your son

18   again?

19   A.    No.

09:44:27  20   Q.    Okay.  I mean, did you like check in his bedroom to see if

21   he was in there?

22   A.    Yeah.  He left.

23   Q.    I mean, did you just assume that he left because the car

24   was gone or did you actually check in his room to see that he

09:44:41  25   wasn't there?

1    A.    No.  When I check outside through the window, I seen the

2    car was gone.  So I didn't check his room, but I know he's not

3    in his room when the car is not there.

4    Q.    Okay.  But you're just assuming that he took the car, you

09:44:55    5    didn't see him take it?

6    A.    Correct.

7    Q.    Okay.  And assuming that it was your son who took the car,

8    you don't know where he would have gone after he left the house;

9    is that correct?

09:45:12    10    A.    Yeah.

11    Q.    Or if he was with anybody?

12    A.    No.  I didn't see anybody, because the car was gone, so I

13    cannot check or I cannot prove anybody when the car is gone.

14    Q.    And -- and did your son drive that car regularly before

09:45:30    15    that night?

16    A.    Sometimes, yeah.

17    Q.    "Sometimes, yeah"?

18    A.    Yeah.

19    Q.    And do you know if he ever drove around with other people

09:45:41    20    in the car?

21    A.    I cannot tell that.

22    Q.    Okay.  Do you know if your son has a lot of friends?

23    A.    He might have, yeah, but I cannot -- I don't see anybody,

24    you know.

09:45:53    25    Q.    Okay.  So you don't really know them?

1    A.    Yeah.

2    Q.    Okay.  And just to clarify, you've never seen your son with

3    a firearm; is that correct?

4    A.    No.

09:46:06    5          MR. BLACK:  Okay.  Thank you.

6          Nothing further, Your Honor.

7          THE COURT:  Redirect?

8          MR. GREENBERG:  No, Your Honor.

9          THE COURT:  All right.  Sir, you may step down.

09:46:16   10    Sir, you may step down.

11          THE WITNESS:  Huh?

12          THE COURT:  You may step down.  You're done.

13          THE WITNESS:  I'm done?

14    Thank you.

09:46:35   15          THE COURT:  Thank you.

16          MR. HOBBS:  Come all the way through here.

17          MR. GREENBERG:  Your Honor, our next witness, and I

18    believe our last, will be Officer Patrick Walters, who I'm told

19    is entering security.

09:46:56   20          THE COURT:  All right.  So you will not be calling...

21          MR. GREENBERG:  What's that, Your Honor?

22          THE COURT:  You will not be calling Mr. Rezene's

23    mother?

24          MR. GREENBERG:  No, Your Honor.

09:47:10   25    She's here.  I've told Mr. Black that we did not intend to

1    call her, but she's available for the defense to call if they so

2    choose.

3                THE COURT:  Thank you.

4                MR. BLACK:  Your Honor, I apologize, one quick matter

09:48:08    5    before Officer Walters takes the stand, which is that my client

6    has requested that his parents be allowed to attend the

7    remainder of this hearing since they will no longer be witnesses

8    this morning.  I'm not planning to call Mr. Rezene's mother.

9    The government has indicated that it doesn't object.

09:48:26    10               MR. GREENBERG:  No objection.

11               THE COURT:  I see no reason why they shouldn't be in

12    the audience.

13               MR. BLACK:  Thank you, Your Honor.  I'll just go let

14    them know that.

09:48:34    15               THE CLERK:  Please come forward.

16               THE COURT:  You may come forward, sir.

17               THE CLERK:  Raise your right hand.

18                              <u>PATRICK WALTERS</u>,

19    called as a witness on behalf of the Government, having been

09:48:40    20    first duly sworn, was examined and testified as follows:

21               THE WITNESS:  I do, ma'am.

22               THE CLERK:  Thank you.  Please take the stand.

23                         (Off the record.)

24               THE COURT:  We're going to get you introduced, but we

09:49:06    25    need to get the parents in first.

1          THE WITNESS:  Of course.

2          THE COURT:  Actually, it's the lawyer that's critical.

3                    (Off the record.)

4          THE COURT:  You may inquire.  Oh, we haven't --

09:49:36  5          THE CLERK:  Yes.  Sorry.

6     Please state your name and spell it for the court reporter.

7          THE WITNESS:  Patrick Walters, P-a-t-r-i-c-k; last

8     name Walters, W-a-l-t-e-r-s.

9                    DIRECT EXAMINATION

10    BY MR. GREENBERG:

11    Q.    Good morning, sir.

12          Where are you employed currently?

13    A.    Currently, I work with the Marysville Police Department.

14    Q.    As you know, you're here to testify about an incident that

09:49:59  15    occurred in the early morning hours of October 31st, 2023.

16          At that time, where were you employed?

17    A.    I was employed with the Seattle Police Department at that

18    time.

19    Q.    How long had you been with the Seattle Police Department?

09:50:13  20    A.    October -- roughly four years.

21    Q.    What were your duties while you were with SPD?

22    A.    I was assigned to patrol.  I worked third watch in the

23    North Precinct area during that time.

24          And before that, I was in the South Precinct.

09:50:27  25    Q.    And were you on patrol the night of this incident?

1    A.    I was, sir.

2    Q.    Okay.  And just without getting, you know, too deep into

3    it, what led to your switch from SPD to Marysville PD?

4    A.    General quality of life updates.  I live up north and so

09:50:46    5    the commute is much shorter.

6    Q.    Yeah.

7          As you found out this morning; is that right?

8    A.    Yes.

9    Q.    Okay.  All right.  Let's talk about the night of -- early

09:50:56    10   morning hours of October 31st, then, 2023.

11         Did you have a partner when you were on patrol that night?

12   A.    I did, sir.

13   Q.    Who is that?

14   A.    Officer Cannon.

09:51:07    15   Q.    And was that a longtime partner for you?

16   A.    Yeah.  As soon as we switched over the scheduling to the

17   four tens, we ended up in the same V area, and so just made

18   sense to ride together.

19   Q.    Okay.  How long had you been partners with Officer Cannon

09:51:22    20   at that point, approximately?

21   A.    I want to say about a year.

22   Q.    So at about 12:46 in the morning, were you dispatched to an

23   incident?

24   A.    Yes, sir, I was.

09:51:39    25   Q.    And what was that?

1    A.    It was a single-car collision, rollover.

2    Q.    Where was that?

3    A.    It was at 105 and Aurora, southbound.

4    Q.    When you arrived, what did you see?

09:51:53  5    A.    So when I arrived on scene, I saw a white SUV, newer model.

6    It was on the -- it was at the west side of the road right in

7    front -- right at the northwest corner of 105 and Aurora.  There

8    was a tree down, tree was in multiple pieces across the roadway,

9    and the vehicle was on its side.

09:52:11  10    Q.    Okay.  And I'm showing you Exhibit 1.

11    We've already seen these, but Exhibit 1, Exhibit 2,

12    Exhibit 3, is this the vehicle you saw?

13    A.    It is, sir.

14    Q.    Okay.  I'm going to show you Exhibit 7.

09:52:33  15    These are some still photos that were taken that have

16    already been admitted, taken from Officer Welte's body camera.

17    Is that you?

18    A.    Yes, it is, sir.

19    Q.    Okay.  And you had a lot more facial hair at that time, it

09:52:50  20    appears?

21    A.    I did, sir.

22    Q.    Okay.  What are you doing in these first two images?  It

23    looks like you're bending over and looking at an object on the

24    ground, and then you picked it up.  What is that?

09:53:03  25    A.    Yeah.  It -- could you scroll back up to the top one?  Oh,

1    okay, I see.

2         So it's a large canister of -- like a whippet can, some

3    type of compressed air or compressed chemical.

4    Q.    Okay.  And then, I'm going to ask you about that in a

09:53:19  5    second, but before I do, was there also another similar whippet

6    item found in the car as we're seeing here?

7    A.    Yes, sir.

8    Q.    Okay.

9    A.    I recall two.

09:53:34  10   Q.    Two in the car and one on the ground?

11   A.    Two in total.

12   Q.    Two total, okay.

13        Do you have training in -- that allows you to explain to

14   the Court what a whippet is?

09:53:46  15   A.    I do, sir.  I'm ARIDE trained.

16   Q.    What's ARIDE?

17   A.    It's Advanced Roadside Impairment Detection.

18   Q.    And what does that train you to do?

19   A.    And so everyone goes through -- during the academy, you go

09:53:59  20   through the basic DUI course to detect alcohol impairment and

21   other minor impairments that could lead to a DUI.  If you choose

22   so, you can take ARIDE, which is an advanced impairment, which

23   teaches you about different drug categories and how they affect

24   the body, and kind of goes to that next level before a DRE.

09:54:15  25   Q.    Okay.  What did you learn in the ARIDE training regarding

1   whippets, you know, what it does to someone's body, how long it

2   lasts, that kind of thing?

3   A.    So whippets can be used in a variety of different things.

4   It's an inhalant is one of the things, the classification.  And

09:54:34   5   in layman's terms, it -- pretty much you suck in a bunch of

6   chemicals and it suffocates the brain, giving a euphoric

7   feeling.  It lasts a very short period of time.  We call it

8   volatile in the system.  And usually, within three to five

9   minutes, it's gone from the system and it's no longer detectable

09:54:50   10   by like a blood draw or anything like that.  It dissipates in

11   the system very quickly.

12   Q.    But is it something that gives you like a quick high, I

13   guess, in layman's terms?

14   A.    Yeah.  It produces a very euphoric feeling, usually they --

09:55:06   15   lethargic, oftentimes they pass out.

16   Q.    After taking it?

17   A.    Yeah, because they've suffocated the brain from oxygen, so

18   then just kind of out, and then a few moments later, they'll

19   come back to.  And after a very short period of time, it's

09:55:16   20   almost impossible to know that they had done it.

21   Q.    Okay.  After you found the whippets on the scene, did you

22   and your partner, Officer Cannon, talk to a witness named Marvin

23   Smith?

24   A.    Yes, we did, sir.

09:55:36   25   Q.    And how did you come upon him?

1    A.    So we were canvassing the area for evidence and witnesses.

2    He was brought to our attention at the bus stop to the south of

3    105.   And was noted that he had seen and helped out in a

4    collision when it initially happened, prior to law enforcement

09:55:54   5    arriving.

6    Q.    And your conversation with Marvin Smith was recorded on

7    your body camera; is that right?

8    A.    Yes, sir; Officer Cannon's as well.

9             MR. GREENBERG:   Okay.   Your Honor, at this time, I'll

09:56:06   10   play a portion of Exhibit 18.

11            THE COURT:   All right.

12                 (Exhibit played.)

13   BY MR. GREENBERG:

14   Q.    Okay.   So Marvin Smith, then, obviously we just heard, gave

09:58:55   15   you a description of the driver of the vehicle.

16        What did you do next?

17   A.    At that point, we broadcasted an updated description and

18   then we did an area check in the direction he indicated.

19   Q.    Okay.   And when you say "we did an area check," who is

09:59:11   20   that?

21   A.    Officer Cannon and I.

22   Q.    In the area that Marvin Smith indicated that the driver

23   fled to?

24   A.    Yes; west of 105, off of Aurora.

09:59:22   25   Q.    Okay.   So then walk us through what you did during -- or

1    what happened while you were doing this area check.

2    A.    So as we were doing the area check, we were headed west on

3    105.

4          Once we came up to I believe it's about 107, there's a bar

5    there with red lights, I think it's Rick's Bar or Ron's Bar, I

6    can't remember the name exactly.  As we were coming up there, we

7    saw a smaller-stature gentleman on a Lime scooter, like one of

8    the green scooters.  I don't know if that was the company, but

9    one of the cit- -- one of the city scooter companies.  He was

10   coming out of the bar area.  He went west in front of us.  And

11   he was roughly the same height.  He had a hoodie on, and the

12   hood was up.

13         As we was going, we decided to get next to him just to kind

14   of see what the description was or if it matched.  He kept

15   looking back.  And then when he looked over, he turned one block

16   west, he turned north on Greenwood.  And as he did that, I saw

17   some dreads come out of his hoodie, which kind of further

18   brought into -- you know, the description we'd had.

19         So we decided to get a little bit closer to see if we could

20   see any injuries or a face, see if that matched at all.

21         Went one block north on Greenwood, and then he took another

22   right down one of the side streets, which brought to my

23   attention, because if you're here and then you go -- and go like

24   that, it's kind of a U-shaped pattern, and he's traveling, which

25   is not typical.  Then he made an immediate right again.

1          And as we followed and then we said, okay, that's -- we

2    have reasonable suspicion to stop him.  He so far matches the

3    height, the weight, we have that same hair, you know, distance

4    from the collision, and time frame, and then making a kind of

10:01:07    5    very suspicious turnaround like that, we decided to stop him.

6          As we rounded the corner, we saw the Lime scooter dumped on

7    the ground and no one was there.  We got up next to the vehicle,

8    activated our lights.  I got out and looked to the left and I

9    saw a gentleman running across the field -- or, excuse me,

10:01:24    10    across the yard, and attempting to jump a field -- or, excuse

11    me, a fence.

12          And at that point, we detained him.

13    Q.    Did you ultimately identify that person as the defendant,

14    Samuel Rezene?

10:01:39    15    A.    Yes, we did.

16    Q.    When you initially detained him and got a better look at

17    him, did he match, generally speaking, the description that you

18    got from Marvin Smith?

19    A.    Yes, sir, he did.

10:01:55    20    Q.    And in what ways?

21    A.    He described him as mostly clean shaven.  And although he

22    had a little bit of facial hair, his cheeks and stuff were very

23    clean.  His height matched, weight matched, skin color matched,

24    his clothing matched, he had the right -- he had shoes on.  I

10:02:11    25    remember noting that -- looking down and seeing bright white

1    stripes on Nike shoes, which is a pretty good description.  He

2    did have light blue grayish jeans on.

3        And then when we inspected him further, underneath his

4    hoodie he had a short-sleeved shirt on.

10:02:29    5    Q.    And did he have dreadlocks as well?

6    A.    Yes, sir he did.

7    Q.    Okay.  So I'm going to show you Exhibit 19.  And it's a

8    little dark and hard to see, but is that Mr. Rezene at the time

9    you arrested him?

10:02:41    10   A.    It is, sir.

11   Q.    Okay.  And you notice his right hand here has blood, I

12   think next to -- next -- Exhibit 20 and Exhibit 21 are close-ups

13   of that.  Is that the way his hand appeared at the time?

14   A.    It is, sir.

10:02:59    15   Q.    And then I'm going to show you Exhibit 22.  What are we

16   seeing here?

17   A.    So that is the -- what I described as the Lime scooter, the

18   community scooter rental stuff, that was laying in the middle of

19   the road after we made our third right-hand turn.

10:03:17    20   Q.    And then Exhibit 23 is a close-up.  Is this the handle of

21   the scooter?

22   A.    Yes, sir; the right handle.

23   Q.    Okay.  And what's the significance of this photograph?

24   A.    So that's blood on the handle of the vehicle that matched

10:03:33    25   the same hand as the detainee at the time and -- which kind of

1    led back to that he was in a crash.  If you remember, our

2    witness also had an injury on his hand, so we kind of put

3    together that there's -- you know, witness had a cut from

4    helping out, it's probable that the person who was in a

10:03:52    5    collision also had some injuries.

6    Q.    Okay.  And this may become a little clearer in a moment as

7    we listen to some of the statements that Mr. Rezene made, but in

8    terms of the timeline of events and what he later claimed to

9    you, what was the significance of blood being on the scooter

10:04:14    10    handle once -- when you found it abandoned on the road?

11    A.    So when I initially questioned him about the injury on his

12    hand, he said he got it from trying to jump the fence, the same

13    fence that I had just seen him at, something to the effect of, I

14    just hurt my hand trying to jump over the fence.

10:04:31    15        But based on the fact that there's blood on the handle here

16    and the time frame from when I saw him on the scooter to when I

17    saw him at the fence, there's -- highly unlikely, some would say

18    impossible, to go back, injure yourself on the fence, come back,

19    grab the scooter, and then make it back to the fence a second

10:04:48    20    time.  So I know that that blood was there prior to him

21    abandoning the scooter and prior to him trying to jump the

22    fence.

23    Q.    Okay.  So you just referenced speaking to Mr. Rezene.  Did

24    you have occasion to do that sort of on and off as this

10:05:06    25    detention went on?

March 26, 2024                    38

1   A.    Yes, sir.

2   Q.    And did Officer Cannon, as well, have an opportunity to

3   talk to Mr. Rezene?

4   A.    Yes, sir, he did.

10:05:17   5   Q.    Okay.  I'm going to play portions of the conversations that

6   you had with him, but let me ask you just as we walk through

7   this, were there times during this discussion that you were

8   pulled away for other -- for other matters to...

9   A.    Yes, sir.

10:05:37   10   Q.    Just kind of like what sort of things were going on that

11   caused you to step away from Mr. Rezene, and then, you know,

12   maybe go back and join in?

13   A.    So at this time, we had the primary incident seen on 105

14   and Aurora where we had officers investigating that and dealing

10:05:54   15   with the collision.  And then we had our scene over on -- I

16   think it was 107 and -- just off of Greenwood, where we had

17   Mr. Rezene detained.  So we had two different collisions -- or,

18   excuse me, two different scenes for the collision.

19   Q.    Okay.  And were you communicating with other officers at

10:06:11   20   the scene?

21   A.    Yes.  Yes.

22   Q.    About how far away was the crash to where you detained

23   Mr. Rezene, approximately?

24   A.    Roughly four blocks, maybe five.

10:06:27   25   Q.    Okay.

1    A.    It's been a while since I've been on that street.

2    Q.    Okay.  I am going to play a portion of Exhibit 18 just for

3    the record.  This is going to be the 21-minute to 23-minute

4    portion.

10:06:48    5        Let me start this and then ask you something first here.

6                        (Exhibit played.)

7    BY MR. GREENBERG:

8    Q.    Does this appear to be your body camera?

9    A.    Yes, sir, it is.

10:07:04    10   Q.    Okay.  I'm just going to play a two-minute clip here.

11                       (Exhibit played.)

12   BY MR. GREENBERG:

13   Q.    Okay.  At this point, it looks like you're walking away.

14   Do you recall what you were going to do at this point?

10:09:25    15   A.    Yes.  At that time, I walked back over to the fenced area

16   to see because he was at a high fence and I couldn't see the

17   back side, so I walked to see if he'd dumped anything over

18   there, or thrown anything, left anything over there.  And then

19   also to see about this fence when he claimed he injured himself

10:09:43    20   on it, to get a better look at what does that look like.

21   Q.    Okay.  While you were doing that, did Officer Cannon

22   continue to speak with Mr. Rezene?

23   A.    I believe so.  He'd be able to testify better on that.

24   Q.    Well, I'm going to show you here Exhibit 28, which is

10:10:02    25   Officer Cannon's body camera.

1    MR. GREENBERG:  And, Your Honor, I'm going to play the

2    23-minute mark to the 27-minute mark.

3    THE COURT:  All right.

4    (Exhibit played.)

10:14:29   5    BY MR. GREENBERG:

6    Q.    Okay.  Officer, you described earlier, I think you used the

7    term "suspicious" in terms of the way Mr. Rezene was driving the

8    scooter, like making right turns constantly and in a circle; is

9    that correct?

10:14:48  10    A.    Yes, sir.

11    Q.    At the time that that was going on, did you have your blue

12    lights on at any point during that?

13    A.    Initially, I don't recall, but by the end, yes.

14          As you can see when we walked up, we'd already left our

10:15:04  15    vehicle and our blue lights were on.  The newer patrol vehicles,

16    when you put them into park, they change.  So if you switch it

17    into drive, it will start doing a much larger red and blue

18    strobe.  Once we put it into park, it will kind of slow the

19    strobing down, so that way we don't mess with everyone's

10:15:21  20    eyesight once we are stationary.

21    Q.    And as you heard here, and I think we already had heard it

22    earlier, Mr. Rezene was trying to explain why he was driving the

23    scooter in that sort of evasive way by saying that he thought,

24    you know, you might have been someone out to get him, he's been

10:15:37  25    shot before; correct?

```
 1   A.    Yes, sir.

 2   Q.    Okay.

 3         Okay.  And then let me go back to your body camera,

 4   Exhibit 18, again.

 5         Did you rejoin the conversation at some point?

 6   A.    Yes, sir.

 7   Q.    Okay.  I'm going to go to the 34:30 mark quickly.

 8                         (Exhibit played.)

 9   BY MR. GREENBERG:

10   Q.    Okay.  And then it looks like you walked away there for a

11   minute?

12   A.    Yes.  I believe that was Officer Samuels handed me the

13   phone, saying that Officer Hugg was on the phone for me.  She

14   was on scene at the collision.

15   Q.    Okay.  And then I'm going to just skip ahead a minute or so

16   to the 37-minute mark and then play the rest of your

17   conversation with Mr. Rezene.

18                         (Exhibit played.)

19   BY MR. GREENBERG:

20   Q.    Okay.  And is that the end of your conversation with

21   Mr. Rezene there at the scene?

22   A.    I believe so, yes.

23   Q.    Okay.  Now, shortly after that, did you learn that officers

24   on the scene of the crash found a firearm in the Yukon?

25   A.    I did.
```

Timestamps:
10:15:51 (line 5)
10:16:24 (line 10)
10:16:34 (line 15)
10:20:36 (line 20)
10:20:55 (line 25)

1    Q.    How did you learn that information?

2    A.    I believe Officer Samuels told me, just after we got done,

3    as I was turning away, I believe him and I had a short

4    conversation where he let me know that Hugg or Welte had brought

10:21:09    5    him up to speed on that.

6    Q.    Okay.  And do you recall learning where they found the

7    firearm in the car?

8    A.    To my recollection, it was in the floorboard of the

9    driver's seat.

10:21:17    10    Q.    Okay.  At that point in time, you had already known and, in

11    fact, I think Mr. Rezene just told you or Officer Cannon that he

12    had -- that he was a convicted felon and that his last offense

13    was for unlawful possession of firearms; correct?

14    A.    Not in so many words, but, yes.

10:21:43    15    Q.    Okay.  And then did you learn of a connection between

16    Mr. Rezene and the registered owner of the crashed Yukon?

17    A.    Yes, we did.

18    Q.    And was that you personally or were you learning this from

19    other officers, if you recall?

10:22:02    20    A.    Semi-team effort, but I believe the primary information

21    came from my sergeant, Officer Belfiore.

22    Q.    And what was the connection that was made?

23    A.    The registered owner of the vehicle was Samuel's mother.

24    Q.    At some point while Mr. Rezene was detained, did you ask

10:22:26    25    other officers to go back -- or to go -- that were at the scene

1    to go to that bus stop and see if they could find Marvin Smith

2    again?

3    A.    I did.

4    Q.    And what was your purpose in doing that?

10:22:38    5    A.    So it's standard protocol if we have somebody detained and

6    we have a witness, to do a field show-up.  So to have an officer

7    talk to him, pick him up, bring him to where our location is,

8    and see if he can identify the suspect.

9    Q.    Okay.  And what was the result of that?

10:22:57    10    A.    He was no longer at the bus stop.

11    Q.    Okay.  And do you know if officers made an effort to try to

12    locate him by searching in like databases or SPD system or

13    anything like that?

14    A.    Yes, we did.

10:23:09    15    Q.    And what kind of efforts were made at that time?

16    A.    So we looked up in RMS, which is the system, I believe

17    somebody looked up in the jail management system to see if that

18    name and date of birth came up with anything.  We looked at CAD

19    history on our -- or, excuse me, Mark43 history, which is

10:23:27    20    Seattle's internal system for paper tracking, and we couldn't

21    find anything.

22    Q.    Okay.

23        Okay.  So at that point, you know there was a gun in the

24    car, Mr. Rezene was a felon, you heard the version of events

10:23:42    25    that he was giving you, and you know that his mom is the

1    registered owner of the car.  Was a decision made to arrest him?

2    A.    Yes.

3    Q.    And for what offenses?

4    A.    Hit-and-run and unlawful possession of a firearm.

10:23:56  5    Q.    And then what happened with Mr. Rezene at that point?

6    A.    Mr. Rezene was transported to the North Precinct.

7    Q.    Okay.  I'm going to show you Exhibit 24, which are some

8    stills.

9          Did you do the transport?

10:24:14  10    A.    Yes, sir.

11    Q.    Okay.

12    A.    Myself and Officer Cannon.

13    Q.    Okay.  These are stills taken from your body camera just

14    showing some of the clothing that he was wearing.

10:24:27  15          So, here, you mentioned some like light-colored jeans.  Are

16    those visible on this first image on Exhibit 24?

17    A.    Yes.

18    Q.    And then we'll see a better image later, but are these Nike

19    sneakers?

10:24:43  20    A.    They appear to be, yes.

21    Q.    And then the second image is a little clearer picture than

22    we saw before.

23          Mr. Rezene had dreadlocks; is that correct?

24    A.    Yes, sir.

10:24:56  25    Q.    And then the third image, did he have a T-shirt on under

1    this sweatshirt?

2    A.    Yes, sir, black T-shirt, short sleeve.

3    Q.    Okay.  And showing you Exhibit 25, do you recognize this?

4    A.    Yes, sir.  Those are the shoes that he was wearing at the

10:25:15    5    time.

6    Q.    Okay.  And what was the significance of these shoes to you?

7    A.    So -- and I noted when we first contacted, but the

8    significance is that our witness had said he had brand-new white

9    Nikes on.  And although they're not completely white, that's a

10:25:29   10    sufficient amount of white for a witness to give that as a color

11    description.

12    Q.    Okay.  And they look fairly new; is that correct?

13    A.    Yes.

14    Q.    Okay.  We saw on the video when you were speaking to

10:25:47   15    Mr. Rezene that he gave a phone number; correct?

16    A.    Yes, sir.  He said it was his phone number.

17    Q.    At some point later on in the evening, did you call that

18    phone number?

19    A.    I did, sir.

10:26:01   20    Q.    And what was your initial purpose in calling it?

21    A.    So, initially, we were trying to locate the phone because

22    he didn't have a phone on him when we searched him after the

23    arrest.  We know that the Lime scooter, sometimes you have to

24    use a phone to log in to do it.  So we were trying to figure out

10:26:20   25    where his personal property was.  So we called the phone to see

1    if it would ring while we had an officer stand by the vehicle.

2    Q.    And what happened?

3    A.    The defendant's mother picked up.

4    Q.    Okay.  And did you have an initial phone call with the

5    mother and then a subsequent longer phone call with both the

6    mother and father of the defendant?

7    A.    I did, sir.

8    Q.    I'm going to play you just a short portion of your first

9    phone call with only the defendant's mother.  And I'll preface

10   it by saying only the tail end and your end of this call was

11   picked up on your audio.  Do you know why that was?

12   A.    Yes, because I activated my body cam after making the phone

13   call.  Initially, like I said, we weren't expecting anyone to

14   pick up the phone, we were just trying to locate it, see if we

15   hear ringing somewhere.  So I didn't have my body cam activated

16   because we were in the precinct area, which is generally a

17   no-recording area.  So when I called it and then somebody picked

18   up, I was a little -- caught a little off foot [sic] by that.

19   So I kind of tried to figure out who I was talking to, like

20   maybe a citizen had picked it up or something.

21        Once I realized if was the defendant's mother, then I went

22   ahead and activated my camera to capture the end of that.

23   Q.    Okay.  So we'll just play the tail end.  This is

24   Exhibit 26.

25                        (Exhibit played.)

1    BY MR. GREENBERG:

2    Q.    Okay.  So we heard you say "So at midnight was the last

3    time you saw him.  Oh, and he was there all day."

4          Were you repeating what the defendant's mother was telling

10:28:32  5    you on the other end of the phone?

6    A.    Yes, sir, I was.

7    Q.    And then shortly after that, did you call that same phone

8    number and speak to both of his parents?

9    A.    I did, sir.  I went back to my patrol vehicle where it was

10:28:47  10   kind of a more controlled environment for noise and background

11   interference and made another call.

12   Q.    Okay.  Now, we've actually already listened to that this

13   morning, so I'm not going to play the whole recording for you

14   again, but I am going to play, with the Court's permission, just

10:29:05  15   two short snippets to confirm your understanding of this call.

16   If -- and the first I would play here is going to be right

17   around the six-minute mark.  This is Exhibit 27.

18                    (Exhibit played.)

19            MR. BLACK:  Your Honor, I would object.  This is

10:29:34  20   cumulative.  It's already been introduced.

21            THE COURT:  Overruled.

22            MR. GREENBERG:  Sorry, I'm just going to go back.

23                    (Exhibit played.)

24            MR. GREENBERG:  All right.  And then just a second

10:30:23  25   quick portion I'm going to play is around the eight-minute-ten

```
 1   mark.
 2                        (Exhibit played.)
 3   BY MR. GREENBERG:
 4   Q.   So both the father and the mother told you on this call
 5   that Mr. Rezene was at home and then left with the car?
 6   A.   Yes.
 7        And he left the residence by himself.
 8             MR. GREENBERG:  Okay.  Nothing further, Your Honor.
 9             THE COURT:  Counsel, how long will you be?
10             MR. BLACK:  It's always hard to say, Your Honor.  I
11   would guess 15 or 20 minutes.
12             THE COURT:  All right.  We'll take a break, then.
13             MR. BLACK:  Thank you, Your Honor.
14             THE COURT:  We'll take a break until 20 minutes to
15   11:00.
16             THE CLERK:  All rise.  Court is in recess.
17                        (Court at recess.)
18             THE CLERK:  Please rise.  Court is again in session.
19             THE COURT:  Mr. Black, you're up.
20             MR. BLACK:  Thank you, Your Honor.
21                        CROSS-EXAMINATION
22   BY MR. BLACK:
23   Q.   Good morning, Officer Walters.
24        My name is Chris Black, and I represent Mr. Rezene in this
25   case.
```

Time stamps (left margin): 10:31:00 (line 5), 10:31:19 (line 10), 10:31:32 (line 15), 10:48:04 (line 20), 10:48:11 (line 25)

1    A.    Good morning, sir.

2    Q.    So on the night in question, you arrived at the scene of

3    the crashed vehicle sometime after the crash; correct?

4    A.    Yes, sir.

10:48:23    5    Q.    Obviously.

6    A.    Yes, sir.

7    Q.    About how long do you think?

8    A.    You'd have to check the CAD dispatch notes for that.  I

9    couldn't give you an accurate estimate.  I would say shortly

10:48:33    10    thereafter.

11    Q.    Within probably 10 or 15 minutes, something like that?

12    A.    At least so, sir.  The spot at 105 and Aurora and the

13    precinct are very, very close in proximity.

14    Q.    When you arrived at the scene, there was no one in the

10:48:49    15    vehicle; correct?

16    A.    Correct.

17    Q.    And there was no one at the scene who appeared to you to be

18    the driver?

19    A.    Correct, sir.

10:48:57    20    Q.    In other words, somebody who had gotten out of the car and

21    was standing around or something like that?

22    A.    Yes, sir.  No one at the scene identified themselves as the

23    driver.

24    Q.    And the crash appeared to be quite serious; is that fair to

10:49:09    25    say?

1    A.    That's fair.

2    Q.    It was -- the car was totaled and flipped over?

3    A.    To my accounts, yes.  I'm not a mechanic on that level, but

4    to my accounts, yes.

10:49:20  5    Q.    Shortly after you arrived at the scene, you spoke to

6    somebody who had been rooting around in the car; is that

7    accurate?

8    A.    No.

9    Q.    "No"?

10:49:34  10    A.    I spoke with somebody who had been rooting around in the

11    area, I can't say that they were rooting around in the car.  I

12    didn't see them in the vehicle.

13    Q.    Okay.  Did any witnesses tell you that they had seen people

14    in the vehicle?

10:49:44  15    A.    Other than the gentleman that I spoke with at the bus stop?

16    Q.    Uh-huh.

17    A.    Not to my recollection.

18    Q.    Okay.  So -- well, do you remember speaking to somebody who

19    was kind of in the trees right beside the car when you arrived?

10:50:00  20    A.    I do, sir.

21    Q.    Okay.  Is that the person who you're talking about who was

22    seen close to the vehicle?

23    A.    Yes, sir.  We identified him back in the -- it was kind of

24    in the fallout of the tree on the west side of Aurora.

10:50:12  25    Q.    Okay.  So he was just seen close to the vehicle, but not in

1    it?

2    A.    Correct.

3    Q.    Okay.  But close enough to reach in or something like that?

4    A.    Not from when I saw him, no.

10:50:22  5    Q.    Okay.

6    A.    Or not when I spoke with him, no.

7    Q.    Not when you spoke with him, but you don't know where he

8    was before you spoke with him?

9    A.    Correct.

10:50:29  10    Q.    Okay.  And you don't know what he was doing when he was

11    around the car; is that correct?

12          You didn't see him there?

13    A.    Yeah.  So I didn't see him around the car, he was over on

14    the sidewalk in the trees.  And to my recollection, he said he

10:50:48  15    was setting his bags down.  He had -- he looked like a person

16    who is unhoused.

17    Q.    Okay.

18    A.    And he had multiple bags that he was setting off in the

19    corner.

10:50:57  20    Q.    Okay.  And after you spoke with that gentleman, you spoke

21    with another person across the street at the bus stop; is that

22    correct?

23    A.    Yes, sir.

24    Q.    He identified himself as Marvin Smith?

10:51:17  25    A.    Yes, sir, he did.

1    Q.    He provided a date of birth upon request; is that right?

2    A.    Yes, sir.

3    Q.    And he declined to give a phone number when one was

4    requested from him; is that correct?

10:51:27    5    A.    Correct.

6    Q.    To your knowledge, law enforcement has not been able to

7    locate Mr. Smith since this incident; is that correct?

8    A.    To my knowledge, that is correct, sir.

9    Q.    Mr. Smith told you that the driver of the vehicle was

10:51:48    10    knocked unconscious from the crash; is that correct?

11    A.    Initially, he stated he passed out, crashed, and then woke

12    up.

13    Q.    Okay.  He said he was unconscious at the time of the crash;

14    is that correct?

10:52:00    15    A.    Yes.

16    Q.    And woke up after the crash?

17    A.    Correct.

18    Q.    He provided a description of the person who he said was the

19    driver; is that correct?

10:52:10    20    A.    Yes, sir.

21    Q.    Said he was short?

22    A.    Yes.

23    Q.    That he had dreadlocks?

24    A.    Yes, sir.

10:52:16    25    Q.    That he was about five-six?

1    A.    I believe so, yes, sir.

2    Q.    And that he was 120 or 110 pounds; is that correct?

3    A.    Yes, sir.

4    Q.    He also said that the driver was wearing a short-sleeve

10:52:30    5    shirt; is that correct?

6    A.    Yes, sir, it is.

7    Q.    He didn't mention anything about a jacket; is that correct?

8    A.    Correct.

9    Q.    He said he was wearing blue jeans; is that correct?

10:52:41    10    A.    Yes, sir, it is.

11    Q.    He said he was wearing brand-new white Nikes; is that

12    correct?

13    A.    Yes, sir.

14    Q.    He didn't say anything about the driver of the car having

10:52:54    15    any face tattoos; is that correct?

16    A.    No, sir, he did not.

17    Q.    When you ultimately interacted with Mr. Rezene that night,

18    did you notice that he has distinctive face tattoos?

19    A.    I noticed he had a face tattoo, yes.

10:53:09    20    Q.    Do you know that he has a cross between his two eyebrows?

21    A.    I did.

22    Q.    Can you see that from across the room here?

23    A.    Yes, I can.

24    Q.    Mr. Smith didn't mention anything about that, though;

10:53:23    25    correct?

1    A.    He did not.

2    Q.    Mr. Smith mentioned a number of times that the driver was

3    hurt and that he wouldn't be able to get far because he was

4    hurt; is that correct?

5    A.    Yes, sir.

6    Q.    Mr. Smith told you that he had tried to get into the

7    vehicle; is that correct?

8    A.    Yes, sir.  I believe his term was when he got in the

9    vehicle, yes.

10    Q.    I'm sorry, can you say that again?

11    A.    I believe his terminology was when he got in the vehicle.

12    Q.    Okay.

13    A.    So I -- yes.

14    Q.    And he told you that he had cut his hand on the glass when

15    -- on the glass in the vehicle when he was trying to get into

16    it; is that correct?

17    A.    Yes, sir, it is.

18    Q.    And he had sort of a bandage or something that he was using

19    as a bandage on his hand?

20    A.    Yeah.  I'd describe it as makeshift bandage.

21    Q.    Sure.

22          And so after you talked to Mr. Smith, you left in your

23    police vehicle to go try to find the person who was the driver;

24    correct?

25    A.    Yes, sir, we did.

1    Q.    And you eventually saw somebody, as you've described, who

2    was riding on a scooter?

3    A.    Yes, sir.

4    Q.    And that eventually turned out to be Mr. Rezene; correct?

10:54:32    5    A.    Correct.

6    Q.    So as you first encountered Mr. -- the person who turned

7    out to be Mr. Rezene, he dropped the scooter and tried to enter

8    a yard; correct?  Or did enter a yard, rather?

9    A.    Yeah.  Clarify first encounter --

10:54:54    10    Q.    When --

11    A.    -- please.

12    Q.    When you -- I guess you were following this person on the

13    scooter, and you called out or something, and the person dropped

14    the scooter and went into the yard; is that correct?

10:55:15    15    A.    Correct.  When we first got out of our vehicle to make

16    contact with Mr. Rezene, yes.

17    Q.    Okay.  And when you first -- when you called out to him in

18    the yard, you yelled at him to get down on the ground; correct?

19    A.    That sounds accurate, yes.

10:55:32    20    Q.    And you put him in handcuffs almost immediately?

21    A.    Yes, sir.

22    Q.    He was asking you what this was all about; is that correct?

23    A.    Yes, sir.

24    Q.    And you initially refused to tell him; is that correct?

10:55:45    25    A.    No, sir.

1    Q.    You didn't keep telling him, just be quiet, we'll get to

2    that, things along those lines?

3    A.    So I was not refusing to tell him, we had bigger concerns

4    of officer safety, given the wider circumstances of it.  But I'm

10:56:00    5    more than happy to tell him when it's safe and feasible to do

6    so.

7    Q.    Okay.  So you didn't tell him?

8    A.    Correct.

9    Q.    But you wouldn't characterize that as refusing?

10:56:08    10    A.    Correct.

11    Q.    Okay.  You told him he matched the description of a

12    hit-and-run suspect; correct?

13    A.    I did, sir.

14    Q.    You, at some point, shortly after you began speaking with

10:56:21    15    him, read him his *Miranda* rights?

16    A.    No, sir, Officer Cannon did, I believe.

17    Q.    Okay.  So one of the officers who was there did that?

18    A.    Yes, sir.

19    Q.    So it was pretty clear that you suspected Mr. Rezene of a

10:56:40    20    crime at that point?

21    A.    Yes, sir.

22    Q.    As we watched on video, you spoke with Mr. Rezene pretty

23    extensively that night?

24    A.    I spoke with him a fair amount, yes, sir.

10:56:52    25    Q.    We saw it --

March 26, 2024          57

1   A.    Yeah.

2   Q.    -- it doesn't really matter how you describe it, you talked

3   to him that night?

4   A.    Yes, sir.

10:56:57   5   Q.    When you were interacting with him, he was speaking

6   normally?

7   A.    Correct, sir.  Never having previous interactions with him,

8   he was speaking like a normal person in full sentences would.

9   Q.    Not slowly?

10:57:15   10   A.    Correct.

11   Q.    Not slurring his words?

12   A.    Correct.

13   Q.    Didn't appear to be groggy or anything like that?

14   A.    Correct.

10:57:21   15   Q.    Did he engage in -- excuse me, engaged you in conversation?

16   A.    To an extent, yes, sir.

17   Q.    He didn't do anything indicating that he was in pain?

18   A.    No.  Well, he did state that his hand hurt.

19   Q.    Nothing beyond that, though?

10:57:39   20   A.    No, nothing beyond that.

21   Q.    When you encountered Mr. Rezene, he was wearing a dark

22   jacket; is that correct?

23   A.    Actually, sir, let -- may I correct my previous statement,

24   Your Honor?

10:57:57   25            THE COURT:  Yes.

1    BY MR. BLACK:

2    Q.    Of course.

3    A.    So at the jail, he did complain of pain from falling from a

4    high fence.  And he was taken to the hospital for evaluation.

10:58:05   5    Q.    So that was at the --

6    A.    At the jail --

7    Q.    -- at the jail?

8    A.    -- during the booking process, they ask questions.  He'd

9    stated that he hurt himself falling from a -- falling off of a

10:58:16   10   fence, and then he was taken to the hospital for evaluation.

11   Q.    Okay.  Thank you for that clarification.

12         So when you first encountered Mr. Rezene, he was wearing a

13   dark jacket; is that correct?

14   A.    Yes, sir.

10:58:38   15                         (Off the record.)

16         MR. BLACK:  Pulling up Exhibit 19, Your Honor.

17   BY MR. BLACK:

18   Q.    If you could take a look at that, that's the jacket he was

19   wearing when you first saw him?

10:58:43   20   A.    Yes, sir.

21   Q.    Okay.  So when you first saw Mr. Rezene on the scooter, you

22   didn't know whether he had a T-shirt on or not; is that correct?

23   A.    Yes, sir; correct.

24   Q.    Okay.  Because he was wearing a dark jacket?

10:58:57   25   A.    Yes, sir.

1    Q.    You had to open his jacket, as we saw, to see that he had a

2    T-shirt --

3    A.    Yes, sir.

4    Q.    -- is that correct?

10:59:04    5    A.    I saw the collar, but, yes, sir.

6    Q.    Was there any indication from Mr. Smith that the driver was

7    carrying a jacket when he left the car?

8    A.    No.  He didn't make any indication, sir.

9    Q.    Okay.  Is there any evidence of the driver of that car

10:59:26    10    picking up a jacket along the way anywhere?

11    A.    There was no information for or against whether or not he

12    obtained clothing afterwards.

13    Q.    Okay.  It was just a few minutes later, though; right?

14    A.    Yes, sir.

10:59:37    15    Q.    Okay.  Mr. Rezene, again, looking at the -- at the exhibit

16    here, appears to be wearing white pants; is that accurate?

17    A.    In this exhibit, yes, sir.

18    Q.    Okay.  And he's wearing sneakers that are primarily black;

19    is that fair to say?

11:00:04    20    A.    That is fair to say, sir, yes.

21    Q.    Okay.  The -- there's a Nike symbol on these sneakers?

22                        (Off the record.)

23    BY MR. BLACK:

24    Q.    Turning to Exhibit 25, so these are the sneakers that

11:00:25    25    Mr. Rezene was wearing; correct?

1    A.    Yes, sir.

2    Q.    Okay.  So there's a white Nike swoosh on the sneaker, but

3    it's pretty small, say maybe about -- looks like an inch?

4    A.    The Nike symbol?

11:00:42  5    Q.    Yeah.

6    A.    I'd say, yeah.

7    Q.    Okay.  But, otherwise, the shoes are mostly black with a

8    white kind of ring around the sole?

9    A.    It appears to me that the entire sole is white, yes.

11:00:56  10    Q.    Fair enough.

11          And this compares to what Mr. Smith described as brand-new

12    white Nikes; correct?

13    A.    Yes.

14    Q.    You never ended up taking Mr. Rezene to be identified, or

11:01:17  15    not, by Mr. Smith; is that correct?

16    A.    Yes, sir.

17    Q.    When you were speaking with Mr. Rezene, he told you that he

18    had been with his girlfriend, or a person he described as a

19    girlfriend and a wife at various points, earlier that night; is

11:01:37  20    that correct?

21    A.    That's correct, sir.

22    Q.    And he offered to take you to the place where she was; is

23    that correct?

24    A.    Yes, sir, he did offer.

11:01:44  25    Q.    But you did not take him up on that offer; is that correct?

1    A.    I respectfully declined.

2    Q.    To your knowledge, has the firearm recovered from the

3    vehicle in this case been tested for DNA?

4    A.    Not to my knowledge.

5    Q.    What about fingerprints?

6    A.    Not to my knowledge, sir.

7    Q.    Do you know if the blood that was on the car pillar has

8    been tested in any way?

9    A.    I do not know, sir, left or right of that answer.

10            MR. BLACK:  One moment, please, Your Honor.

11                        (Off the record.)

12            MR. BLACK:  Nothing further, Your Honor.

13            THE COURT:  All right.  Redirect?

14            MR. GREENBERG:  I don't have anything, Your Honor.

15            THE COURT:  The Court has one question.

16                        EXAMINATION

17    BY THE COURT:

18    Q.    Were the keys ever recovered?

19    A.    Not to my knowledge, Your Honor.

20            THE COURT:  Thank you.  You may step down.

21            THE WITNESS:  Thank you, Your Honor.

22                        (Off the record.)

23            THE COURT:  Good luck getting back to Marysville.

24            THE WITNESS:  Thank you, Your Honor.

25            MR. GREENBERG:  And, Your Honor, one other matter, I

 1    spoke to Mr. Black about this yesterday.  The parties are

 2    stipulating to the fact that the firearm that was seized is a

 3    real firearm and that the ATF has confirmed that it had traveled

 4    in interstate commerce.

11:03:36    5         THE COURT:  Is that correct?

 6         MR. BLACK:  That's correct.

 7         THE COURT:  All right.

 8         MR. GREENBERG:  The government has no further

 9    witnesses, Your Honor.

11:03:42   10         THE COURT:  Mr. Black, does the defense wish to call

11    any witnesses?

12         MR. BLACK:  Your Honor, the defense is not calling any

13    witnesses.

14         And I do want to just quickly note that I recognize that I

11:03:51   15    had asked for a number of continuances of this hearing for the

16    reason of securing witnesses.  And I assure the Court's that

17    that was all in good faith, but subsequent events have changed

18    our plan for that, so we have no witnesses, Your Honor.

19         THE COURT:  All right.  Then I will hear closing

11:04:09   20    arguments.

21         MR. GREENBERG:  Thank you, Your Honor.  I'll be brief.

22         We submitted a brief ahead of time to the Court, and the

23    Court has seen the evidence, but on the standard that we're here

24    before the Court today to address, which is a -- whether it's

11:04:31   25    more likely than not that Mr. Rezene was the driver of this car

1    and possessed that weapon, we think the evidence very clearly

2    establishes both of those things.

3         There is a variety of things I'll point to first.  The

4    identification from Mr. Smith that while not 100 percent

11:05:06    5    perfect, it's quite remarkably accurate.  This is a black male,

6    height, weight match, dreadlocks, relatively clean shaven,

7    young, male, yes, blue jeans, they were sort of light-colored

8    jeans.  He did have a T-shirt, and he had brand-new Nike shoes

9    on, which they're not all white, but there's quite a bit of

11:05:31    10    white on them.

11         And in the heat of the moment, with Marvin Smith

12    essentially rescuing Mr. Rezene out of that car, for him to come

13    up with that detailed of a description and for the officers to

14    have found such a matching description only blocks away, I think

11:05:48    15    speaks volumes.

16         But, of course, on top of that, we know that Mr. Rezene was

17    only blocks away on a scooter with apparently nothing else going

18    on.  His account of why he was there and what he was doing is

19    completely ridiculous, that he was visiting a girlfriend who

11:06:08    20    didn't have a phone.  He didn't know where she lived.  He was

21    going to the liquor store.  He wasn't driving a car, yet he

22    somehow got what he claims from Burien all the way up to North

23    Seattle, that was probably also a lie.  It sounds like he had

24    been at his parents' house, which is in South Seattle, also

11:06:27    25    quite a distance away.  So really no reasonable explanation

 1    coming from Mr. Rezene.

 2        Of course, we know that the -- this was his family's car,

 3    his mother's car.

 4        We know from the statements that the parents made that he

 5    had left the house with that car around 11:30 or midnight.  So

 6    within an hour of that crash, which the math adds up if you were

 7    going to leave from South Seattle and get up to North Seattle,

 8    that's about -- that makes good sense.

 9        On top of all of that evidence, Your Honor, we also have an

10    absence of any other explanation.  The defendant claimed to the

11    police that he was visiting his girlfriend.  That -- she's not

12    here to say anything about that.

13        There was information conveyed to the Court by the defense

14    that there would be witnesses to talk about how there was like a

15    carjacking incident that happened here and that that's what this

16    was all about and Mr. Rezene wasn't driving that car.  That is

17    not presented to this Court; as incredible as that would have

18    been, there's nothing offered here at all.

19        And so we would submit that the overwhelming evidence is

20    that the defendant committed that hit-and-run accident and

21    possessed the gun in the car.

22        THE COURT:  What is the government's view of the

23    evidence that the police are in a marked police car when they

24    encounter Mr. Rezene on the scooter?  Is that correct?

25        MR. GREENBERG:  Yes, that is correct.

1          THE COURT:  And is there any explanation among the

2     evidence as to why he then translates that into someone was

3     there to kill me and I needed to flee across this yard?

4          MR. GREENBERG:  I mean, that's just -- no, I mean, I

11:08:30   5     think that was part of the non-credible claims that Mr. Rezene

6     was making to the officers to explain the whole situation.  And

7     that was my interpretation of that is -- and the offices were

8     asking him, well, why are you avoiding us?  Why are you running

9     from us?  And he -- that's what he came up with.  He said

11:08:51   10    essentially, oh, I didn't realize it was police, I thought it

11    was someone out to get me.  I've been shot before, that's why I

12    was evading you.  So that's just one of the lies that I would

13    believe the defendant told that night.

14          THE COURT:  All right.  Thank you.

11:09:04   15         MR. GREENBERG:  Yes, Your Honor.

16          THE COURT:  Mr. Black.

17          MR. BLACK:  Thank you, Your Honor.

18    Your Honor, there's no direct evidence that Mr. Rezene

19    possessed the firearm that night, wasn't -- it wasn't found in

11:09:22   20    his possession.  There's no testing of DNA or fingerprints or

21    anything like that.

22          There is, admittedly, some evidence connecting him to the

23    allegations.  The gun was found in a vehicle owned by his

24    family.

11:09:43   25         THE COURT:  That he had borrowed that evening.

March 26, 2024          66

1    MR. BLACK:  That he had potentially been in earlier

2    that evening.  We would -- we would acknowledge that there's

3    testimony to that effect.

4    THE COURT:  Well, the testimony, as I understand it,

11:09:57   5    this chronology is important to me, as I'm trying to get the

6    most balanced view that I can, his parents testified that it was

7    11:30, dad's going to bed, Mr. Rezene says, I'm going out, and

8    takes the key.  And shortly thereafter, his dad looks out and

9    the car is not there anymore.

11:10:25   10    MR. BLACK:  That's basically correct, Your Honor.  I

11    believe -- so it was around 11:30.  And I'm just trying to

12    recall, I don't want to misstate anything, whether his dad said

13    that -- that he saw Mr. Rezene with the key and getting ready to

14    leave, but there was some discussion of he might be going

11:10:44   15    somewhere.  And then his dad went to bed, and then he saw the

16    car gone, but didn't confirm that Mr. Rezene was not there.

17    THE COURT:  And that conversation occurred in his

18    parents' home.  And his parents' home, I've been told, is some

19    distance from 105th and Aurora.

11:11:04   20    MR. BLACK:  Correct.

21    THE COURT:  Okay.

22    MR. BLACK:  Then there's also, of course, the fact

23    that Mr. Rezene was located in the neighborhood near where the

24    car was crashed, and that there was a witness who described some

11:11:23   25    features that are consistent with Mr. Rezene.  And so we would

1    acknowledge that, but submit that those facts are not enough for

2    the Court to find by a preponderance of the evidence that

3    Mr. Rezene was the one who possessed the firearm that night, or

4    that he knowingly possessed a firearm that night.

11:11:44    5         THE COURT:  I'd like to continue to talk about, the

6    car's crashed, the witness who identifies himself to the police

7    later is the person who goes over and apparently through, I'm

8    going to assume the car roof, glass top, he reaches in,

9    apparently is -- I'm trying to piece this together from having

11:12:20    10   to read the reports and whatever, to see if the driver is all

11   right; Is that correct?

12         MR. BLACK:  That is what he stated, yes.

13         THE COURT:  Okay.  And what is your theory, if you

14   have one, as to where the gun came from?  This Good Samaritan

11:12:42    15   drops the gun in the car, or we just don't know?

16         MR. BLACK:  That is a potential theory, although we

17   recognize that there are issues around it, but either him or

18   there was another person who was close to the car when the

19   officers arrived.  Theoretically, that person could have dropped

11:13:00    20   the gun in there as well.

21      However, Your Honor, I'm going to get to that question of

22   where the gun came from or how it got in there.  My first -- the

23   first segment of our argument was about whether or not

24   Mr. Rezene was actually the person who was identified as the

11:13:19    25   driver.  If --

1      THE COURT:  And I've got my questions answered about

2  that, so please continue.

3      MR. BLACK:  Okay.

4      THE COURT:  And finish your thought on that, and then

11:13:29  5  move on to what you're going to move on to next.

6      MR. BLACK:  Perfect.  Thank you, Your Honor.

7      Just we submit that the description from Mr. Smith was not

8  close enough to the description -- or to Mr. Rezene's actual

9  appearance and attire for the Court to find that it was him.

11:13:56  10      While there are some consistencies, you know, in terms of

11  short, dreads, skinny, Mr. Rezene is all of those things,

12  Mr. Smith said that the driver was wearing new white Nikes;

13  whereas, we'd submit the shoes that were recovered or that

14  Mr. Rezene was actually wearing would not be reasonably

11:14:20  15  described as new white Nikes, they're black.  I mean, there is

16  some white on them, but I don't think that that's -- anybody

17  would reasonably describe them as white shoes.

18      And Mr. Smith described the driver as wearing jeans.  We'd

19  submit that, as Officer Walters admitted, the pants that

11:14:50  20  Mr. Rezene was wearing were white pants.  If you look at the

21  photo, they appear to be more like sort of khakis than jeans,

22  but Your Honor has that photo to take a look at.

23      And we'd submit that this is a big one.  Mr. Smith said

24  that Mr. Rezene is wearing a T-shirt.  There's no way --

11:15:10  25  Mr. Rezene was wearing a T-shirt, but it was covered in a black

 1   jacket, which there was no way that Mr. Smith could have known.

 2           THE COURT:  Well, let me stop you there.

 3       Did I hear any testimony how the driver was dressed, I

 4   mean, that he had on the -- you know, there's been multiple

 5   terms used, a hoodie?

 6           MR. BLACK:  No, no, Your Honor, there was definitely

 7   no testimony as to that, it was just only a T-shirt.

 8           THE COURT:  Well, you seem to be implying that, you

 9   know, it's a significant consideration that he has on a jacket,

10   but I'm not sure when he puts that on over the T-shirt.

11           MR. BLACK:  Well, Your Honor --

12           THE COURT:  Is there anything in the record to explain

13   that?

14           MR. BLACK:  So the issue would be somebody is in this

15   car crash, they are apparently passed out, wake up, and run

16   away.  They're wearing a T-shirt.  There's no mention anywhere

17   of a jacket or where that would come from.

18       And so when Mr. Rezene is then found in a jacket later,

19   there's no explanation for why -- how he could have come into

20   contact with a jacket and be wearing one.  It's inconsistent

21   with what Mr. Smith was saying.

22           THE COURT:  All right.  Thank you.

23           MR. BLACK:  Another issue with the identification, we

24   would submit, is that Mr. Smith never mentioned Mr. Rezene's --

25   or never mentioned a face tattoo from the driver, which

 1   Mr. Rezene has, which is very distinctive, as the Court can see,

 2   and as Officer Walters acknowledged.

 3          THE COURT:  You shouldn't make assumptions about the

 4   Court's eyesight.

11:17:05   5          MR. BLACK:  Fair enough, Your Honor.

 6       Officer Walters indicated that he could see it that night

 7   and could see it in court here today.

 8       And it's the kind of thing that would certainly be

 9   noticeable and if you're providing a description of somebody to

11:17:22  10   the police that you would note.  When you're talking about what

11   he's wearing, you know, what's on his face, things like that, it

12   seems like the kind of thing that one would never leave out.

13   But in any event, Mr. Smith didn't mention anything about that.

14       Mr. Smith said that the driver was injured, that he

11:17:44  15   wouldn't be able to get far because he'd just been knocked out,

16   and seemed to be very certain that whoever was driving that car

17   would be exhibiting signs of injury from that serious wreck;

18   whereas, Mr. Rezene when he was encountered by the police didn't

19   exhibit any of those signs.

11:18:06  20          THE COURT:  Well, let's talk about that.  The hand in

21   the photograph, it's bleeding pretty copiously.  And, you know,

22   if you have someone who is passed out in a car and the hand is

23   bleeding noticeably, I'm not sure what assumption that you --

24   consideration, conclusion I should reach from that.  But I

11:18:37  25   wasn't that troubled by him saying that, you know, yeah, he's

1   not going to get very far.  I mean, he doesn't know that the

2   government's asserting that it's this drug that you recover

3   from.  He doesn't know why he's passed out, all he knows is that

4   he flees and has got -- if it's, indeed, as he describes it, or

11:19:02   5   as it's described in the photograph, it's a noticeable wound.

6        MR. BLACK:  Well, certainly Mr. Rezene had a wound --

7   a cut on his hand, and we're not disputing that.  The point is

8   that Mr. Smith, who observed the driver leaving the vehicle,

9   seemed to think that because of the fact that he had passed out

11:19:27   10   and been in this accident that he wasn't going to be able to get

11   far and was suffering from the impacts of that kind of accident,

12   and that -- that was not apparent, but, admittedly, the cut is a

13   different issue.

14        THE COURT:  Well, explain to me your explanation on

11:19:46   15   the cut.  I mean, are you sticking with he ran across the field,

16   but, you know, he cut his hand on the fence, then he goes back?

17   I mean, I'm --

18        MR. BLACK:  Well, the explanation on the cut is that

19   it's not apparent where it did come from, and the Court doesn't

11:20:07   20   have evidence of that.  And we do have, apparently, blood in the

21   vehicle; however, we know that Mr. Smith did cut his hand when

22   he was trying to get in and had a bandage on his hand for that.

23        THE COURT:  Well, give me your explanation for the

24   handle on the scooter.  The scooter doesn't appear until after

11:20:32   25   the accident's over and done with, the driver's out of the car.

1    According to the government's theory, you know, his hand is

2    injured, and Mr. Smith says his hand is injured, and his hand is

3    injured.  Then if that's the case, then encountering the

4    scooter, if it's based on the fence, how did the handle get --

11:21:05    5    it's the same hand that the hand is cut on, how did it get

6    bloody?

7          MR. BLACK:  Your Honor, we're not putting forward the

8    theory that the cut came from the fence.

9          THE COURT:  Well, I think I listened to your client

11:21:17    10    say that on the video.

11          MR. BLACK:  Understood, Your Honor.

12          THE COURT:  All right.  Continue on, please.

13          MR. BLACK:  And I guess to just address one last point

14    from Your Honor's last questions, it does not appear from

11:21:43    15    anything that Mr. Smith said that he thought that the driver was

16    not going to be able to get far because he had a cut hand, it

17    was more related to the -- being passed out, but I'll move on

18    from that.

19          So based on all this, we'd submit that the evidence does

11:22:01    20    not establish that Mr. Rezene was the person who was driving the

21    vehicle that night; however -- and then that would be a defense

22    to both the unlawful possession charge and the hit-and-run

23    charge.

24          However, beyond that, even if it was Mr. Rezene who was

11:22:21    25    driving the car, we'd submit that the facts do not support a

1    finding by a preponderance of the evidence that Mr. Rezene knew

2    that the firearm was in the car.  We recognize that the fact

3    that he was near the car and that it was his family's car is

4    probably not a complete coincidence, but that is not enough to

5    make the next leap to say that he's the one who put the gun in

6    the car and knew about it.

7        He could have, you know, at some previous point loaned the

8    car to a friend.  He could have had people in the car later that

9    night.  These people are people who might have left a firearm

10   there.  Mr. Rezene admittedly has associates who, you know, in

11   the past have carried firearms.  And it's not too much of a

12   stretch to think that somebody else who had a firearm was

13   present in that vehicle at some point and could have left it

14   there.

15       The crash was obviously violent, flipped the car.  You

16   know, that gun, assuming it was in there at the time of the

17   crash, could have been almost anywhere within the cabin of the

18   car and moved around, and the tow truck came and flipped the car

19   over after the crash, and that -- if not likely, certainly at

20   least potentially, could have moved the gun around.

21       And the point there is that the firearm, assuming that it

22   had been in the car, was -- or could have been in a place where

23   it was hidden that Mr. Rezene would not have known about.

24            THE COURT:  I want to make sure I understand this:

25   The parents have denied any gun ownership.

1          MR. BLACK:  Correct.

2          THE COURT:  It is the mother's car.

3     So your explanation for how the gun got in the car was he

4   picked up someone along the way and they had the gun; is that

11:24:30   5   what I'm left with?

6          MR. BLACK:  That is a potential explanation, that it

7   could have happened earlier that night, or that it could have

8   happened on an earlier day.

9          THE COURT:  Well, I've not heard any testimony that he

11:24:44   10   had the car on another day.  And I believe I heard at one point,

11   although it's not been brought out in the hearing, that he took

12   an Uber from somewhere to his parents' house.  He was staying

13   with his brother in Burien or something.

14          MR. BLACK:  Your Honor, it's correct that the Court

11:25:02   15   does not have evidence that other people drove the car

16   previously, but I guess there's no evidence to the contrary, is

17   what we're saying, so we don't know when the gun could have been

18   placed in the car.

19          THE COURT:  All right.

11:25:20   20          MR. BLACK:  And then the last point I want to make is

21   that even assuming that Mr. Rezene made some statements to the

22   police that weren't completely accurate, that does not

23   necessarily imply knowledge of the firearm.  He was immediately

24   arrested upon the officers encountering him, put into handcuffs,

11:26:01   25   told that he was under suspicion for a hit-and-run.  He's on

1   federal supervision.  You know, he knows at that point that, you

2   know, regardless, there's trouble.  And so to the extent that

3   anything might have been said that wasn't accurate, it would

4   apply equally to that as to the firearm possession.  And the

11:26:21   5   point there, again, is just that that doesn't necessarily speak

6   to any kind of knowledge about the firearm.

7        And so, you know, given --

8        THE COURT:  Would you agree with me -- I mean, I tried

9   to watch this, I mean, we kindly were given the exhibits in

11:26:39   10   advance, and the only times that I hear Mr. Rezene basically

11   lying is exculpatory to his involvement.  I mean, he answers

12   truthfully a whole bunch of stuff, and then when they ask him

13   questions that potentially will expose that he's involved in

14   this, he basically starts lying.  What is -- what conclusion

11:27:06   15   should I draw from that in terms of his truthfulness?

16        MR. BLACK:  Well, Your Honor, the only point I'm

17   making here is that whether Your Honor draws any conclusion

18   about his truthfulness from that, it doesn't necessarily apply

19   to knowledge of a firearm being present.

11:27:26   20        THE COURT:  I understand.

21        MR. BLACK:  And, Your Honor, just based on the lack of

22   physical evidence and all these other factors, we're asking the

23   Court to find that the government has not met its burden of

24   establishing these violations by a preponderance of the evidence

11:27:44   25   and asking the Court to dismiss them.

March 26, 2024

```
 1              THE COURT:  You touched on the last two questions I

 2   have; the burden is on the government, as I understand it, and

 3   both of you acknowledge that.

 4              MR. BLACK:  Yes.

 5              THE COURT:  All right.  The standard is preponderance

 6   of the evidence; correct?

 7              MR. BLACK:  Yes, Your Honor.

 8              THE COURT:  Sometimes that's, in the circuit, listed

 9   as more likely than not.  Is that a standard that you'd accept,

10   or alternative definition for preponderance of the evidence?

11              MR. BLACK:  We would agree that that's the standard.

12              THE COURT:  The case law says that periodically.

13              MR. BLACK:  Yeah.

14              THE COURT:  And then, lastly, if I find unlawful

15   possession of a firearm and the crime of hit-and-run, that those

16   would be violations of the mandatory conditions in the Judgment

17   from the underlying offense.

18              MR. BLACK:  We do agree that if Your Honor finds that

19   the violations occurred, that they would be violations, yes.

20              THE COURT:  Okay.

21         What else would you like me to know, Mr. Black?

22              MR. BLACK:  Your Honor, the last point is that I am

23   not sure if the government has established the legal criteria

24   for hit-and-run, or that it occurred in this case.

25              THE COURT:  Well, they're alleging a violation of
```

1    11.56.440, hit-and-run property damage, duty in case of accident

2    with property.  I guess we don't count the tree as property, but

3    the vehicle certainly would be.

4        It says that the operator involved in the accident shall do

11:29:47  5    the following:  Immediately stop such vehicle at the scene of

6    the collision.  Well, that happened here.

7        B, then and there locate and notify the owner or person in

8    charge of such property of the name and address.  In this

9    instance, he's denying that it was him.

11:30:09  10        And leave in a conspicuous place upon the property struck a

11    written notice giving the name and address of the operator and

12    owner of the vehicle so striking the property.

13        What element of that has the government failed to plead?

14            MR. BLACK:  Whether the tree constitutes property

11:30:28  15    under the statute.

16            THE COURT:  Well, you consider the car to be property?

17            MR. BLACK:  The car is certainly property, but I

18    believe the wording in the statute is that it's property other

19    than the vehicle, is my reading of that.

11:30:53  20            THE COURT:  All right.  Then I understand your

21    argument.

22            MR. BLACK:  Thank you, Your Honor.

23            THE COURT:  Mr. Greenberg, would you like to discuss

24    the accident resulting in damage to property other than the

11:31:09  25    vehicle?

1          MR. GREENBERG:  Yes, Your Honor.

2          And I'm showing Exhibit 2.  And we certainly believe that

3     that this is the property, that we're looking at the building

4     that was described by the officer.  There's a tree on its

11:31:28   5     property and it's clearly damaged, and so that's the property

6     that was damaged.  The tree either belongs to the City of

7     Seattle or it belongs to this Aurora House building that we

8     heard testimony of, and that's exactly what 11.56.440 is talking

9     about, that when you damage property that isn't another vehicle,

11:31:50  10     you're supposed to do what we all understand, which is to

11     provide notice to the owner of the property, instead of fleeing

12     the scene, which is what happened here.

13          Along the way, I was making notes myself, but the Court's

14     questions indicated that it was sort of rebutting some of the

11:32:09  15     points I was going to make along the way with Mr. Black, so I'm

16     not going to repeat any of that.  I will only say that the term

17     "consciousness of guilt" is what comes to my mind when listening

18     to Mr. Rezene's story to the police officers.  And so I disagree

19     with Mr. Black.  I think the Court can very well draw an

11:32:31  20     inference of guilt from that, as jurors could at a trial in a

21     similar situation.

22          And so on the preponderance of the evidence standard, Your

23     Honor, we believe we've met that for both violations.

24          One administrative matter that I would ask the Court to do,

11:32:51  25     which is -- I've spoke to Mr. Black, and I understand he talked

1   to Mr. Rezene, and they made the decision -- the defendant made

2   the decision not to testify.  I think we should probably put

3   that on the record before the Court rules.

4          THE COURT:  All right.  Mr. Rezene, are you aware of

11:33:12   5   the fact that you have a right to testify at today's hearing and

6   that you have voluntarily chosen not to exercise that right?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  All right.  Thank you, sir.

9      I don't find this to be a particularly close question based

11:33:35   10   on the totality of the circumstances.

11      I'm prepared to find under that preponderance of the

12   evidence standard that the gun was in the car with Mr. Rezene.

13      I came out here expecting there to be some greater

14   discussion of the car coming from his parents and where it ended

11:34:09   15   up, particularly in terms of information that had been

16   previously provided to the Court, which had a whole different

17   set of explanations related to it.

18      I think the evidence is more than substantial and certainly

19   greater than a preponderance, and I therefore find that

11:34:41   20   Mr. Rezene committed the crime of unlawful possession of a

21   firearm on October 31, 2023.  Further, that he committed the

22   crime of hit-and-run on October 31, 2023, and that both of those

23   are a violation of a mandatory condition in the Judgment that

24   was entered in the underlying matter by this Court.

11:35:08   25      Counsel, anything further on behalf of the government?

1          MR. GREENBERG:  No, Your Honor.

2      I think we can work with the Court to schedule a

3  disposition hearing down the line.

4          THE COURT:  That's what you're going to find out next

11:35:21  5  from the in-court deputy.

6          MR. GREENBERG:  Okay.

7          THE COURT:  Mr. Black?

8          MR. BLACK:  Nothing further from the defense, Your

9  Honor.

11:35:27  10          THE COURT:  All right.  Counsel, thank you.

11      It's interesting.  We had a couple of Seattle Police

12  officers testify.  I was impressed by Officer Walters' courtesy.

13  The North Precinct and I have a long history since they sued me

14  as part of the consent decree.

11:35:58  15      And a difficulty the Seattle Police Department has at this

16  time is retaining officers and attracting new officers.  And one

17  of the problems that the department is having is the number of

18  them who are going to other jurisdictions, particularly

19  Marysville, which has an attractive bonus program, in addition

11:36:26  20  to less traffic.

21      Counsel, thank you.

22      The clerk, do you have a date?

23                    (Off the record.)

24          THE COURT:  The sentencing will be on April 9 at 9:30

11:36:57  25  a.m.

1          We will be in recess.

2              THE CLERK:  All rise.  Court is in recess.

3                  (Court recessed 11:36 a.m.)

4                  C E R T I F I C A T E

5      I certify that the foregoing is a correct transcript from

6      the record of proceedings in the above-entitled matter.

7                      /s/ Marci E.C. Chatelain

8                  Marci E.C. Chatelain, CCR, RPR, RMR, CRR
                   Federal Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25