UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

─────────────────────────────────────────────────────────────

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     ) CASE NO. CR16-185-JLR
                                   )
v.                                 ) Seattle, Washington
                                   )
SAMUEL REZENE,                     ) May 15, 2024
                                   ) 10:21 a.m.
                    Defendant.     )
                                   ) FINAL REVOCATION HEARING
                                   ) OF SUPERVISED RELEASE
                                   )

─────────────────────────────────────────────────────────────

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES L. ROBART
UNITED STATES DISTRICT JUDGE

─────────────────────────────────────────────────────────────

APPEARANCES:


  For the Plaintiff:       TODD GREENBERG
                           STEPHEN HOBBS
                           United States Attorney's Office
                           700 Stewart Street, Suite 5220
                           Seattle, WA 98101



  For the Defendant:       MICHAEL NANCE
                           Law Offices of Michael Nance
                           PO Box 11276
                           Bainbridge Island, WA 98110



  Reported by:             NANCY L. BAUER, CCR, RPR
                           Federal Court Reporter
                           700 Stewart Street, Suite 17205
                           Seattle, WA 98101
                           nancy_bauer@wawd.uscourts.gov

1                    PROCEEDINGS
2    _____

3         THE CLERK:  Case No. CR16-185, United States versus
4    Samuel Rezene.
5      Counsel, please make your appearances for the record.
6         MR. GREENBERG:  Good morning, Your Honor.  Todd
7    Greenberg and Stephen Hobbs for the United States.  We're joined
8    by Probation Officer Mi Young Park.
9         THE COURT:  Thank you.
10        MR. NANCE:  Good morning.  Mike Nance representing
11   Samuel Rezene, on my right.
12        THE COURT:  Thank you.
13     Counsel, we are here for the sentencing phase.  The court
14   has conducted a prior hearing and found that Mr. Rezene was,
15   indeed, responsible for two supervised release violations.
16     I have reviewed the government's memo; I've reviewed the
17   material that I received from probation; and I've recently
18   received Mr. Nance's memo.
19     The probation and government request revocation of the
20   supervised release, imprisonment of 24 months, and supervised
21   release of one year, on both of them.  Mr. Nance's memo suggests
22   a shorter period; basically, a time-served sentence and no
23   supervised release.
24     So I will also tell you that I had a chance to go back and
25   review my notes from the prior hearing, and so I feel fairly

1   well informed regarding this.

2        Mr. Greenberg, I'll hear from you first, please.

3             MR. GREENBERG:  Thank you, Your Honor.

4        One of the repeated themes in the memo the defense filed

5   was to complain about what they call "a very old history that

6   the government dredges up" in our disposition memorandum.

7   There's a few different places in their memo that they complain

8   about this, and I find that argument to really miss the mark

9   here, and I would ask the court to reject it.

10       The reason the government did that, and reason the

11  government did focus on Mr. Rezene's conduct that was about ten

12  years ago now, is because that is, actually, the most recent

13  history Mr. Rezene has, living in our community.  He was

14  arrested at the end of 2014, he served a state sentence, and

15  then he came into court custody, and the court knows what

16  happened from there.

17       And so besides the 80-day period in 2023 that Mr. Rezene

18  was in the community, leading us to these violations, the last

19  time he was in our community was in 2014.  And the court also is

20  very familiar with what happened at that time period.

21       Mr. Rezene was robbing drug dealers, engaged in shootouts

22  back and forth, drug dealing himself.  And then went into

23  custody, and then he came out for 83 days, and here we are.

24       I don't think any of us are naive enough to think that it

25  was on day 83 that he possessed that firearm for the first time.

 1   So somewhere in there, he possessed the firearm, and then on day

 2   83, he recklessly drove down Aurora Avenue at a high speed,

 3   totaled his parents' new Yukon SUV, which is saying something,

 4   because that is a very big vehicle, and then fled, leaving his

 5   gun behind.

 6       So the most recent data points that this court has to

 7   evaluate what Mr. Rezene's conduct is likely to be, moving

 8   forward in the community, is that period leading up to 2014 and

 9   then these 83 days.

10       Even with that history, the defense asks this court to

11   terminate supervision.  That, to me, is a comical request.

12       He has served 83 days on supervision, total, and managed to

13   end up here with serious violations that quickly.

14       I would tell this court that supervised release exists

15   exactly for a situation like this and for a defendant like this,

16   who, clearly, has not displayed a willingness to abide by the

17   court's conditions of release, and from whom the public needs to

18   be protected, because, again, the last couple of times he's been

19   in the community, he's engaged in dangerous acts, he's engaged

20   in dangerous behavior.

21       And even after the violations, there has been no contrition

22   and nothing to show this court that Mr. Rezene is taking this

23   seriously or even feels bad about his conduct.  Because after

24   these violations, first he fled and lied to police, then he

25   tried to gin up witnesses to come before this court and tell

1    some bogus story about a carjacking that occurred.  That flamed

2    out.  And then along the way, he's pressuring his own mother not

3    to talk to the police anymore and to claim that she doesn't

4    remember anything because she was on medication, et cetera, et

5    cetera.

6         And so all told, Your Honor, this is, unfortunately, a

7    defendant who, even after serving a lengthy sentence imposed by

8    the court, has shown us that his behavior hasn't changed, and

9    there's no reason to suspect that it will in the near term.

10        In asking for termination, the defense memorandum concludes

11   by saying, "He must learn, if he hasn't already, to live

12   peacefully, legally, and respectfully."  Well, he hasn't already

13   learned that, and that's the point of supervised release.  It

14   will either help or, hopefully, force a defendant to learn how

15   to live peacefully, legally, and respectfully, but we're not

16   there now with Mr. Rezene.

17        So we would ask the court to impose a sentence of 24

18   months, and then 12 more months of supervised release to follow.

19             THE COURT:  Thank you.

20        Mr. Nance, welcome to the proceeding, sir.

21             MR. NANCE:  Thank you.

22        I would note, it's kind of ironic, today, I believe, is the

23   ten-year anniversary of Mr. Rezene being shot and almost killed,

24   May 15th, 2014.

25        I would suggest that this case is one of, kind of, rough

1    justice in action.  Mr. Rezene has lived a very turbulent life.

2    He's certainly had run-ins with the law and with others.  He

3    originally did prison time, I believe, for dealing drugs, and at

4    some point thereafter armed himself for protection from what he

5    perceived to be unsavory elements.

6         He was shot, almost killed.  Maybe as a part of that, he

7    ran afoul of federal gun laws, for which he received a rather

8    stiff sentence, 92 months, by this court.

9         I would note that that sentence employed an advisory

10   guideline that used prior convictions that have since been

11   vacated.  So if he were being resentenced today, it would be a

12   lower guideline range to begin with, and that might have

13   affected the sentence.  We don't know.

14        The predicate offenses for that were nonviolent offenses.

15   I think it was a state court VUCSA drug offense and a state

16   court firearm offense.

17        He's now before this court not for anything violent but

18   for, again, possessing a firearm and for a misdemeanor driving

19   offense.  The court has found he committed those violations at a

20   previous hearing.

21        And he's done six and a half months already.  Since his

22   arrest, he's been in custody since October 31st.

23        I prominently mentioned in my memorandum and the government

24   hasn't uttered a peep in response to the case of

25   *United States v. Duarte*.

1          THE COURT:  You don't need to.  The federal public

2     defender filed two 56-page briefs, arguing exactly what you're

3     arguing, and the government filed not quite as long of a

4     response.

5          MR. NANCE:  I haven't seen either.

6       The condensed, as I interpret it, it's 75 pages and a lot

7     of history, more history than I've seen in a court opinion,

8     ever, really.  If I reduced it down to a paragraph, it would be

9     that, for nonviolent felons, like Mr. Rezene, the Second

10    Amendment right to arm himself with a firearm for

11    self-protection trumps the power of the government to prohibit

12    it.

13         THE COURT:  Let me stop you, because I need you to

14    articulate for me what I found to be the most remarkable

15    sentence in your briefing, "nonviolent felons like Mr. Rezene."

16         MR. NANCE:  Yes.

17         THE COURT:  Would you explain to me how Mr. Rezene is

18    a nonviolent person?

19         MR. NANCE:  I will.  I will.

20         THE COURT:  And I'd like you to address at age 17,

21    tells the sheriff after they fought, "I am going to kill all of

22    you"; age 21, promoting prostitution, a 14-year-old who is

23    assaulted by Mr. Rezene in a vehicle; tells her that he's going

24    to kill her family if she doesn't go be a prostitute.

25       I'm well acquainted with the Holly Park Cribs and the Tuk

1   Town Kings.  I've, regrettably, had multiple cases involving

2   that, including this one.  And how many shots were fired in the

3   gas station?  And how many shots were fired on Martin Luther

4   King Way --

5           MR. NANCE:  The number --

6           THE COURT:  -- blowing the place up, you know,

7   shooting it up.  And then we've got, at gunpoint, gun robberies,

8   not one of them but two of them, and that's a nonviolent person?

9           MR. NANCE:  Those are all disputed.  There's never

10  been a conviction for any of that.

11          THE COURT:  There have been pleas.

12          MR. NANCE:  To my knowledge, not involving -- there's

13  not a single prior offense deemed violent by either the state or

14  the federal law in his history.

15          THE COURT:  Your argument is that it's got to say

16  "violent offense" now?

17          MR. NANCE:  That's the way that I read the statute.  I

18  think that's the way the Ninth Circuit read it.

19          THE COURT:  Well, the Ninth Circuit went out of its

20  way to draw the distinction, because they didn't want to accept

21  your argument, which was this individual was a prior felon, he'd

22  done a number of bad things.  So they carved out what seemingly

23  is this interesting loophole that will have to get fleshed out.

24  But that's the nonviolent felon, and I'm asking you to look at

25  Mr. Rezene's history here.

1    He's admitting carrying guns, using them.  I mean, these
2  were admissions that he robbed these people at gunpoint.  And,
3  you know, you didn't just defend yourself when you pulled into
4  the gas station; you aggressively go forth and announce you're
5  going to fire a number of shots, and you do so.  And then you go
6  on social media and you say -- I wrote this down because I
7  didn't know what it means; it's something about "watch the
8  bodies drop."
9    I respect you as a lawyer, and you've been in here to tell
10  me some whoppers, but this one really takes the cake.
11    This is a violent individual who carries a gun at all
12  times.  Eighty-three days out, and he's already got a gun, and
13  he's driving around on Aurora Avenue in prostitution blocks with
14  a gun?  Really, sir?
15         MR. NANCE:  You left out the part about gang signs.
16  That could be Texas Longhorns, too.  But there's --
17         THE COURT:  That's the new state seal for Hawaii.
18         MR. NANCE:  Is that it?
19         THE COURT:  Yes.
20         MR. NANCE:  I read the *Duarte* case as referring -- the
21  term "nonviolent felons" is referring to felons who've not been
22  convicted of a formal violent offense.
23    Now, if it's so obvious he's done these other things, he's
24  never been convicted of it.  If he's robbing drug dealers, why
25  hasn't he been charged with it?  It just didn't happen.  He

 1    denies that he did that.

 2              THE COURT:  Where?

 3              MR. NANCE:  Ask him right now.  He denies it.

 4              THE COURT:  What I know is the record that's before me

 5    is that he told, proudly, the investigating officers, "Yeah, I

 6    robbed this guy, and that's what touch off this gang war."

 7              MR. NANCE:  Yeah.  He disputes that.

 8              THE COURT:  No, his lawyer disputes that.  I've never

 9    heard him say he didn't do it.

10        He's all over social media saying, you know, Yeah, you

11    know, me and my buddy Buzz, or somebody, ripped this guy off, we

12    got $1,500 and a bunch of drugs.

13              MR. NANCE:  I mean, that's -- that's what -- perhaps

14    that's what on social media.  That -- that's -- there's not

15    been --

16              THE COURT:  That's what your client put on social

17    media, sir.

18        And then he talks to the police officer, he says, Yeah --

19    you know, how did this happen?  Well, we robbed this guy, you

20    know, and he was a King, and that touched off the war between

21    the Rangers and the Kings.

22              THE DEFENDANT:  Can I say something?

23              THE COURT:  You'll get your chance.

24        If the lynchpin of your argument here is that the *Duarte*

25    case excuses the possession of the firearm, and I should just

1  look at it as a hit-and-run, six and a half months might well be

2  the appropriate sentence.  But that's not how I read *Duarte*.

3  I'll be curious to see how the rest of the overwhelming number

4  of decisions that come down are the ones that I tend to agree

5  with, as opposed to one panel of the Ninth Circuit.

6          MR. NANCE:  I mean, that's the most recent ruling we

7  have.  It, fortuitously, happened three or four days ago.

8  That's where we are.

9      Just for sake of argument, I would submit that it requires

10 a conviction and not references in a presentence report or

11 anything that hasn't resulted in an actual conviction.

12     If it was so obvious that he had robbed drug dealers, he

13 would have been charged, and that just hasn't happened.

14          THE COURT:  What's your stance, then, on relevant

15 conduct?  I have a lot of trouble with the doctrine of relevant

16 conduct, but in sentencing, relevant conduct is still being

17 accepted, and that doesn't require a conviction, it just needs

18 to be relevant conduct.

19     In fact, I believe the Ninth Circuit recently said that, in

20 response to exonerated proceedings --

21          MR. NANCE:  But *Duarte* goes to the constitutionality

22 of the conviction itself.  I think relevant conduct is more --

23 isn't that more appropriate to the type of sentence?  The

24 conviction still has to be a valid conviction in the first place

25 before the sentencing is appropriate or is legitimate.

1          THE COURT:  Well, you have two offenses here.

2          MR. NANCE:  You're speaking to the hit-and-run?

3          THE COURT:  Yes.

4          MR. NANCE:  Yeah.  You found that he violated that.  I

5    haven't checked it closely, but that was the municipal code

6    violation, probably a six-month statutory max on it.  He's done

7    in excess of that.  So I think he's been adequately punished for

8    that.

9          I would just say that he's made some major mistakes in the

10   past.  I mean, no one disputes that.  But he's suffered very

11   harsh consequences for what he's done.  I would suggest the

12   system has exacted its pound of flesh from him more than once.

13   He should take his experiences as a serious, harsh life lesson,

14   and resolve to change his tune.

15         He has a plan.  He'd like to go back with his parents.  His

16   parents are in court, by the way.  They're here.  One option

17   would be to change scenery entirely, and he has a sister in

18   Dallas.  You probably know that.

19         Our suggestion is the court accept the dictates in the

20   spirit of *Duarte*.  Perhaps we read it differently than the court

21   does.  Remove the disabilities that continue from that

22   constitutionally suspect conviction, and sentence him to time

23   served and terminate supervision.  That would be rough justice.

24   It would be a proper disposition here.

25         THE COURT:  Before you go, I have an academic question

1    for you.

2         You make the argument that, if the law in this case would

3    be changed, the sentencing guideline range would be changed.

4    How do you respond to the argument that if the government, who

5    has complete charging discretion, knows that it can't get the

6    sentence it wants under one crime, it then brings a different

7    crime?

8         So I'm always suspect when somebody comes in and says,

9    Well, they wiped out the underlying conviction so you should

10   drop the range because of that.  It seems to me that that

11   assumes some action on the part of the government, which I'm not

12   sure they would particularly do.  Like I said, it's an academic

13   question.

14             MR. NANCE:  The guidelines, as you know, are advisory

15   anyway.  I'm not sure I have a direct answer to that.

16        As I calculate it in my -- even if he was a category six at

17   the time of sentencing, and I think the 92 months was probably

18   mid-range, roughly; there were a couple of marijuana convictions

19   that were vacated, that would take him down to a category five.

20   And then there are one or two state firearm convictions that are

21   subject to the same analysis.  If they didn't apply, it would be

22   down to a four.  So anyway, you can take it as low as you want,

23   but that's what that's about.

24             THE COURT:  Mr. Rezene, now is your chance to talk.

25   Please slide the microphone over.  You don't have to go up to

1    the podium.

2                THE DEFENDANT:  Okay.  Can I stand up?

3                THE COURT:  Stay seated.  I'm trying to make this as

4    comfortable as I can for you.

5                THE DEFENDANT:  I never admitted to robbery at

6    gunpoint.  I admitted to thefts.  That's one thing.

7         Also, I adamantly denied, since day one, that I'm a gang

8    member or a gang leader.  I think you ruled last time, when I

9    had my attorney, Emily Gause, you sustained that they can't say

10   that I'm a gang member or a gang leader.  They can say I'm from

11   this neighborhood, and the government agreed on that, and they

12   still saying I'm a gang leader and a gang member.

13        I know I have violent allegations.  A lot of those

14   charges -- first of all, the convictions are nonviolent, and I

15   just -- sometimes I had to plead guilty to charges that I really

16   didn't even commit, because of the fear of being found guilty at

17   trial and receiving a harsher sentence.

18        And about the threat to that 14-year-old girl and her

19   family, I was -- if you check the discovery, you'll see I was

20   never the one who did that.  It was, actually, my accomplice.  I

21   wasn't there at the time.  I just got charged with rendering

22   criminal assistance by giving him a ride and providing transport

23   to the area.  And I had no knowledge at the time of what was

24   going on, and that's the reason why they dropped it to a gross

25   misdemeanor.

1    At the same time, like my attorney stated, you know, I feel

2    like I've been punished enough.  You know, it's like beating a

3    dead horse, me doing some more time.

4    I'm 36 now.  I did nine years straight, almost ten now with

5    this violation.  I'm just, like -- there's nothing that -- it's

6    not helping me, it's not helping my family, it's not helping the

7    community by me going and doing more time.  If anything, it's

8    delaying me from continuing my life in a positive manner, which

9    I've been learning to do.  Like I said, I'm 36.  All these

10    crimes and these allegations were from over ten years ago.

11    When I got out, I got out to do the right thing.  I got

12    hired doing carpentry.  I filled out a resumé on Indeed.  I got

13    hired immediately.  My probation officer knows about it.  The

14    only reason why I didn't start work was because, for some

15    reason, my social security card was not valid because -- it's

16    crazy.

17    They said that I wasn't an American citizen, and I went

18    down to the Social Security Office and I had to prove I was a

19    citizen.  My father lost my naturalization papers, and I had to

20    file for a new one, and it takes six months.  So while I was

21    waiting on that, and I got locked up here.  And they just sent

22    something in the mail maybe a month ago.

23    I got hired, $35 an hour.

24    I've been staying away from everybody.  I've just been

25    around my family.

1          I know you believe that I'm the one who committed this

2     hit-and-run and this gun charge, and I don't want to speak on

3     that, because, as the prosecutor stated before, there could be a

4     possible indictment, so I don't want to go into that.

5          But I can honestly say that I'm a changed man.  I'm trying

6     to live my life positively.  I want to move and not look over my

7     shoulder for enemies, but it's been so long, I don't even have

8     any enemies, I don't have no problems, I don't feel no fear.  I

9     just want to work.  I just want to be with my family -- I have a

10    brand-new nephew -- and, you know, be able to live my life and,

11    you know, be able to change people's perception of me, because

12    all they see is what the prosecutor said about my past, and, you

13    know, I believe that, in the future, I'll be able to be a

14    representative of people that got out of prison for these type

15    of crimes and was able to make a turnaround and be able to be a

16    positive influence in my community to people and kids or teens

17    that's going down that same path.  Maybe I can speak to them and

18    give them my history and my experiences, and, you know, give

19    them knowledge that I never got when I was young, and,

20    hopefully, they'll take heed to it.  I believe I would have if I

21    had -- you know, if I had an older brother or a mentor who'd

22    actually been through what I'd been through, you know, maybe I

23    would have went down a different path.

24          You know, at the same time, six and a half months, I

25    believe that's -- that's enough.

1          And I didn't think I was going to come in front of your
2    court until my 18-month period, to vacate my supervision for
3    good conduct and having a good job and, you know, a stable
4    address, and, you know, just -- I didn't think I was going to
5    come back in here like this.  It's unfortunate, and I believe if
6    you give me the chance, I'll prove it to you, and I'll be able
7    to do good in the community wherever I'm at, whether I'm in
8    Seattle or I'm in Dallas, I'll be able to have a stable income
9    with a legitimate job doing carpentry.
10         I love carpentry and working with my hands.  I was very
11   excited to start work, and it's unfortunate that my social
12   security card didn't go through.  I asked my for probation
13   officer's help, numerous times, to prove that I was a citizen,
14   and she told me that she couldn't, that she could only help me
15   get a state ID.
16         And she knows I got employed at Madden Industrials as an
17   apprentice, and after a few projects, they would start me off as
18   a journeyman, because I already have five years' experience
19   working for my Eritrean community when I was younger.  I'm a
20   certified carpenter.
21         Yeah, man, I just hope you don't, you know, use my past
22   against me again, because I just did 92 months for that.  And
23   while I did all this time, I've been in USPs, and I never met
24   anyone else who had a gun charge, a 922(g), that had as much
25   time as me.

1          THE COURT:  Well, sir, let me asked you a question.

2      What you've just asked me to believe is that you're living

3   in Holly Park, and you walk up to a guy who is affiliated with

4   the Tukwila Kings, and you say, "Please give me your money and

5   your drugs," and they said, "Okay."

6          THE DEFENDANT:  No, no.

7          THE COURT:  That's what you just told me.

8          THE DEFENDANT:  No.

9          THE COURT:  You said, "Oh, I wouldn't have had a gun."

10         THE DEFENDANT:  What happened was they gave me the

11  marijuana.  I left.  I was supposed to bring the money, and I

12  didn't.  No, they gave me the money for the marijuana, and I

13  never give them the marijuana.  That's what happened, and that's

14  exactly what I told the officers, and that's what was in the

15  report.  I don't know if you recollect, but that's what was

16  said.  There was never no robbery, no gun, no force, none of

17  that.  It was just a theft.

18         THE COURT:  Well, let's move forward, then.

19      Somehow, after a number of really dangerous drive-by

20  shootings, one of which is alleged to be you, by the police, you

21  encounter -- you won't come out during the day.  You're there,

22  it's past midnight when you were in the gas station with your

23  girlfriend.

24         THE DEFENDANT:  Say that again.

25         THE COURT:  The gas station shooting, you wouldn't

1   leave the house during the day, but you're driving around at

2   night with your girlfriend.

3          THE DEFENDANT:  No.  Actually, I do be out in the day.

4   I never said that I don't go out in the day.  I just happened to

5   be out that night.

6          THE COURT:  Out at 2:00 a.m.?

7          THE DEFENDANT:  It was about 3:00, 4:00 in the

8   morning.  The tire was flat.

9      I was 26.  I was 26 years old.  I was young.

10         THE COURT:  What I want to know is, why did you have

11  this gun?

12         THE DEFENDANT:  Back then?

13         THE COURT:  Back then.

14         THE DEFENDANT:  I feared for my life, to be honest.

15         THE COURT:  Well, if you've never done anything wrong,

16  you were always in the wrong place at the wrong time, why did

17  you fear for your life?

18         THE DEFENDANT:  Well, because of my house being the

19  target of shootings, my girlfriend being killed, people around

20  me that I grew up being killed, it just happened so random, when

21  you least expect it, and I felt like this firearm would help me

22  and protect my life.

23      And, as a matter of fact, to be honest, Your Honor, I

24  don't -- I mean, I regret that I'm a felon in the first place to

25  where I couldn't possess a firearm, but that gun, actually,

1    saved my life.  If I didn't have that firearm that day, I would

2    have died.  So I thank God I did have that gun that day.

3        I've never been charged with an assault with a firearm.  I

4    was under investigation for that.  They dismissed it.  They

5    charged me with a drive-by shooting, which, after a mistrial,

6    the prosecutors wanted to give me a gun charge, and I was

7    reluctant to do that, but knowing, like I said before, the time

8    that I was facing if I got found guilty at trial, I pled guilty

9    to a gun charge stemming from that.

10       But, like my lawyer said, none of my crimes that I've been

11   convicted of are violent.  None of them.  And if I robbed drug

12   dealers or anything like that, why haven't I ever been charged?

13   I admitted to thefts, being honest with these police officers.

14           THE COURT:  Well, sir, if you're in the gas station,

15   and they shoot at you, and you pull out your -- it was, what, a

16   Glock 40 extended clip?

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  Did you shoot at them?

19           THE DEFENDANT:  I don't even know.  I just shot in the

20   direction where I felt the gunfire was coming from.  I didn't

21   have time to look.

22           THE COURT:  You could have hit a couple of

23   pedestrians, you could have hit someone who worked at the gas

24   station, and you don't think that's violent?

25           THE DEFENDANT:  The thing is --

1          THE COURT:  Don't say "the thing is."  Tell me if

2    that's violent or not.

3          THE DEFENDANT:  It was self-defense, so, no, it wasn't

4    violent.  It was self-defense.  And the prosecutors admitted --

5    they was, like -- the prosecutors told my attorney, which my

6    attorney relayed to me, If we could charge him with assault for

7    shooting that gun at that person, we would charge him, but we

8    can't because we admit that it was self-defense.  He was shot

9    numerous times before he even retrieved the gun and shot back.

10   It was purely self-defense.

11         The only thing that was wrong about what I did was, I

12   possessed the firearm before my life was in danger, according to

13   the government.  So that's why I was charged and convicted for

14   possession of a firearm.

15         But I believe that if I endangered somebody or if I did

16   anything wrong by shooting that gun back, I would have been

17   charged with assault, because I admitted shooting back at this

18   person, where I believed he was at, and, you know, like you

19   said, anything can happen, you know, yes.

20         THE COURT:  That's my point, sir.

21         THE DEFENDANT:  Yeah, you're right about that.

22         THE COURT:  You've been in jail --

23         THE DEFENDANT:  That's why I changed my life, like,

24   completely.  I don't hang around the same people.  I don't

25   associate -- I don't have social media anymore.  The prosecutor

1    is talking about social media from back then, and other people

2    were on my social media, also.  I can't even access my social

3    media, even today, because it's been hacked a few times.  I

4    don't even want social media so I don't even bother with it.

5         I just want to live my life in peace, and I don't want to

6    associate or know or being known by the same people that I've

7    been known by before, whether it was friends or foes.

8         I'm not the same person I was nine years ago.  I learned a

9    lot since my 92 months.  You know, I've been studying.  I've

10   completed a lot of programs.  I wish I would have brang [sic] my

11   computation sheet and showed you all the programs I completed.

12   I've completed over 20 programs while being locked up.

13        Other than that --

14             THE COURT:  Let me ask you two questions, sir:  One,

15   how many days after you were released from 92 months in prison

16   did you buy the gun?

17             THE DEFENDANT:  This is the thing, Your Honor.  I

18   don't want to speak about that -- anything about that case due

19   to --

20             THE COURT:  I understand that they dismissed those

21   charges at the request of the government and asked that you be

22   prosecuted in this court.

23        Is that correct, Mr. Greenberg?

24             MR. GREENBERG:  They dismissed the charges, and we

25   took them in as a violation.  I think there's still an open

1    question as to whether another criminal case is going to be

2    filed or not.

3              THE COURT:  Then don't answer my question.

4              THE DEFENDANT:  Yeah.

5              THE COURT:  You know, your explanations to me are

6    reminiscent of the tooth fairy.  This thing about "I don't know

7    how the gun got in the car," you know, and "I rode my bicycle --

8    oh, no, I rode my scooter, and I was chasing after the people

9    who stole my car, which was crashed into a building," you know,

10   sir, you just, kind of, make stuff up.  I don't know what else

11   to say.  You just, kind of, make it up.

12       You're raising your hand, so go ahead.

13             THE DEFENDANT:  I never said anything about a stolen

14   car or chasing people.  That never came out of my mouth, ever,

15   to police officers, to the government, to even my attorney.

16             THE COURT:  So they made it up?

17             THE DEFENDANT:  Also the attorney and my lawyer,

18   Christopher Black, which is the reason why I fired him, he

19   didn't bring up evidence that you should have been privy to

20   about there was, actually, looters that went in the vehicle,

21   multiple looters.  Officer Walters, on his body cam, which

22   should have been presented to you, was told by the Seattle Fire

23   Department, when they was on the scene because they was there

24   before him, that they seen one of the guys in the vehicle,

25   stealing.  And he, actually, had bags, shopping bags, and he

1   told Walters, "Yeah, I was just looking for people," and Walters

2   was, like, "I don't believe you.  Did you take that out of the

3   car?"  And the homeless man said, "No," and Walters didn't

4   investigate much.  He was, like, "What were you doing in that

5   car?"  He was, like, "Oh, I was looking for people, and I

6   dropped my hat in the car."

7        There were other 911 callers who reported at the time.

8   That's in the discovery that the prosecutor didn't bring up.

9   People were looting the vehicle, because they called 911 about a

10  car accident, and they was, like, people are entering the

11  vehicle, multiple people, like, a group of them, and, you know,

12  there's just a lot of --

13          MR. NANCE:  I would ask the court to clarify the basis

14  for finding, if you are finding, that he is a violent felon.  Is

15  it the fact that he returned fire after being fired upon?

16          THE COURT:  Sir, don't try to put words in my mouth,

17  and sit down.  You don't ask me to make findings in the course

18  of a sentencing hearing.

19       I am finding that your statement that this person is a

20  nonviolent felon is not supported by the record.  I don't know

21  how to be clearer than that.

22       You were not here for the episode about riding the tricycle

23  or the bike or the scooter, chasing after the car.  I mean, this

24  stuff -- he was in a phone call to his mother saying, "Stop

25  talking to the police.  You weren't there.  Don't tell them what

1    happened."  Don't tell them what happened?

2              THE DEFENDANT:  No, I never, Judge Robart --

3              THE COURT:  You're on the tape.  That's a problem.

4              THE DEFENDANT:  Respectfully, I never told her don't

5    say what happened.  I told her that she needs to get an attorney

6    and an interpreter.  She doesn't know how to speak English.

7    That's exactly what I told her.

8         I believe I would have got tampering with a witness, if

9    that was the case, if I really said that, which the government

10   would have happily charged me with.  All I said was to get an

11   attorney, get an interpreter, and you weren't there.  That's all

12   I said.

13             THE COURT:  That's what you say.

14             THE DEFENDANT:  Yeah.

15             THE COURT:  The circumstances of this offense is

16   twofold.  I have found both of them.  The nature and

17   circumstances of the defendant, at age 37, has not learned a

18   thing.  He gets out, he immediately obtains a gun, leaves his

19   parents home at 12:30 at night, borrowing their car, which he

20   crashes into a building.

21        The preposterous story that came out of that, that I'm now

22   told, is, "Oh, I didn't say any of that stuff in the police

23   record."  The fact that there is a tape recording of the police

24   officer talking to your mother, who seems very cogent, I'm

25   supposed to ignore that.

1          The best thing that I've heard out of this case is that

2     there have been no further dirty UAs and he hasn't missed a drug

3     test.  That's to his credit.

4          In terms of the other things under the 3553(a) sentencing

5     factors, Mr. Rezene has absolutely no respect for the law.  He's

6     very talented at it, but he has no respect for it.

7          I can't impose a sentence that I probably would feel more

8     comfortable with, because it would be longer, because of the

9     decision of the U.S. Attorney's Office in their charging of this

10    case.

11         And, you know, I, frankly, consider the need of the public

12    to be protected from Mr. Rezene, since I've heard nothing but

13    "I'll get another gun because I'm in danger and I'll protect

14    myself," and his way of getting around that is to move out of

15    state.  Good luck, sir.  Don't buy a gun when you go to Texas.

16         I'm revoking the current term of supervised release.  I'm

17    ordering 24 months of custody, one year of supervised release.

18         Do you have a judgment, Mr. Greenberg?

19              MR. GREENBERG:  Yes, Your Honor.

20              THE DEFENDANT:  That's crazy.  That's bullshit.

21              MR. GREENBERG:  If I may show it to counsel?

22              THE COURT:  Yes.

23              THE DEFENDANT:  I've been in the halfway house for

24    five months.

25              THE COURT:  You get credit for time served, sir.

1          Mr. Rezene, would you put your hand over the mike?  It's

2     really sensitive.

3               MR. NANCE:  We would ask for a recommendation that he

4     remain at FDC.  He may anyway.

5               THE COURT:  I think he will anyway.

6               MR. NANCE:  Shorter sentence.

7               THE COURT:  You're talking about 18 months remain on

8     his sentence?

9               MR. NANCE:  Yeah.

10              THE COURT:  They're not moving him.

11              THE DEFENDANT:  No, they will.  They moved me last

12     time, with only four months left, all the way back to Virginia.

13     That's far away.

14              THE COURT:  That's up to them.  I can't control what

15     you do in detention, and I can't control what the Bureau of

16     Prisons does.  If they moved you with four months left, they had

17     a reason, most likely.

18              THE DEFENDANT:  That's my institution that I came out

19     of last time, and they sent me back over there when I violated

20     the halfway house.  So if you can put a hold on me to stay at

21     SeaTac or go to Sheridan?

22              THE COURT:  No.  I would recommend Sheridan, if that's

23     where you're wanting to go, but I'm going to get you out of

24     Seattle.

25              THE DEFENDANT:  Sheridan?

1          THE COURT:  You just told me you feared for your life

2    and --

3          THE DEFENDANT:  Not in prison.

4          THE COURT:  Don't interrupt me.

5       You told me you feared for your life and you bought a

6    gun --

7          THE DEFENDANT:  I never bought a gun.

8          THE COURT:  That's right.  It accidentally appeared in

9    your car.  The homeless man dropped it in there while he was

10   searching your vehicle.

11         THE DEFENDANT:  It's possible.  We don't know who

12   dropped it in the car.  There was a few...

13         THE COURT:  I've signed the judgment in the criminal

14   case, dated it 15 May 2024.

15      Anything further from the government?

16         MR. GREENBERG:  No, Your Honor.

17         THE COURT:  Anything further on behalf of Mr. Rezene?

18         MR. NANCE:  Nothing further at this time.

19         THE COURT:  All right.  Then we're in recess.

20            (Proceedings concluded at 11:05 a.m.)

21

22

23

24

25

```
1                      C E R T I F I C A T E
2

3

4             I, Nancy L. Bauer, CCR, RPR, Court Reporter for
5    the United States District Court in the Western District of
6    Washington at Seattle, do hereby certify that I was present in
7    court during the foregoing matter and reported said proceedings
8    stenographically.
9             I further certify that thereafter, I have caused
10   said stenographic notes to be transcribed under my direction and
11   that the foregoing pages are a true and accurate transcription
12   to the best of my ability.
13

14

15             Dated this 26th day of June 2024.
16

17                            /S/  Nancy L. Bauer
18                            Nancy L. Bauer, CCR, RPR
                              Official Court Reporter
19

20

21

22

23

24

25
```